IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA

UNITED STATES OF AMERICA, )
)
           Plaintiff, )
)
      v. )    Civil No. 6:14-CV-1534-ORL-22TBS
)
JASON P. STINSON, individually and )
d/b/a LBS TAX SERVICES and NATION )
TAX SERVICES, LLC, )
)
           Defendant. )
)

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

The United States of America, for its complaint against Jason Stinson ("Stinson"),

individually and doing business as LBS Tax Services and Nation Tax Services, LLC, alleges as

follows:

1.    This is a civil action brought by the United States under 26 U.S.C. ("I.R.C.") §§

7402, 7407, and 7408 to enjoin Stinson, and anyone in active concert or participation with him,

from:

    a.    acting as a federal tax return preparer or requesting, assisting in, or
directing the preparation or filing of federal tax returns, amended returns,
or other related documents or forms for any person or entity other than
himself;

    b.    preparing or assisting in preparing federal tax returns that he knows or
reasonably should know would result in an understatement of tax liability
or the overstatement of federal tax refund(s) as penalized by I.R.C.
§ 6694;

    c.    owning, operating, managing, working in, controlling, licensing,
consulting with, or franchising a tax return preparation business;

    d.    training, instructing, teaching, and creating or providing cheat sheets,
memoranda, directions, instructions, or manuals, pertaining to the
preparation of federal tax returns;

.

e.   engaging in any other activity subject to penalty under I.R.C. §§ 6694, 6695, 6701, or any other penalty provision in the I.R.C.; and

f.   engaging in any conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

2.   This action also seeks, under I.R.C. § 7402, an order requiring Stinson to disgorge to the United States the proceeds that Stinson and his businesses received for the preparation of federal tax returns that make false or fraudulent claims.

### Authorization

3.   This action has been requested and authorized by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General of the United States, pursuant to I.R.C. §§ 7402, 7407, and 7408.

### Jurisdiction and Venue

4.   Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1340 and 1345 and I.R.C. § 7402(a).

5.   Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Stinson resides in this district, and all, or a substantial part, of the activities giving rise to this suit occurred in this judicial district.

### Defendant

6.   Stinson resides in Longwood, Florida. In May 2011, he created Jason Stinson, LLC, a limited liability company organized in Florida. In September 2011, Stinson amended Jason Stinson, LLC's articles of organization and renamed the entity: Nation Tax Services, LLC. Stinson is listed as Nation Tax Services' managing member and, through Nation Tax Services, LLC, he operates an LBS Tax Services franchise that, in 2013, consisted of 12 tax return

2

preparation stores. In 2014, Stinson began operating his tax preparation stores under the name Nation Tax Services.

7.    LBS Tax Services is a tax return preparation business that Walner G. Gachette franchises through Loan Buy Sell, Inc., a corporation organized in the State of Florida. In 2013, there were at least 239 LBS Tax Services stores in Florida, Georgia, North Carolina, South Carolina, Tennessee, Alabama, Mississippi, and Texas. LBS Tax Services franchise stores prepared more than 55,000 federal income tax returns in 2013.

8.    Stinson and many of his managers and preparers, along with several other LBS franchisees and the LBS franchisor Walner G. Gachette, engage in pervasive tax fraud by making (and/or directing or encouraging others to make) false claims on their customers' tax returns, including: fabricating business income and expenses, claiming false itemized deductions, reporting bogus education credits, and engaging in other fraudulent activities aimed at maximizing their customers' refunds and, in turn, their fees.

9.    Currently, the LBS franchise is operating primarily in the Southeastern region of the United States. But it is spreading rapidly. Its stated goal is to have 1,000 LBS tax return preparation stores operating throughout the United States by 2016. Consequently, if not enjoined, LBS's business model of fraudulent tax return preparation threatens to grow from a regional problem, to a nationwide epidemic.

10.   This lawsuit is one of several suits being filed simultaneously by the United States of America against the LBS franchisor and many LBS franchisees, managers, preparers (and/or former LBS Tax Services franchisees, managers, and preparers operating under new business names) seeking injunctive relief under the Internal Revenue Code to stop LBS's systematic and pervasive fraud. The other cases filed on this date are: *United States v. Walner G. Gachette*

(M.D. Fla.); *United States v. Douglas Mesadieu* (M.D. Fla.); *United States v. Jean R. Demesmin* (M.D. Fla.); *United States v. Kerny Pierre-Louis, et al.* (M.D. Fla.); *United States v. Demetrius Scott* (M.D. Fla.); *United States v. Jacqueline Nunez* (M.D. Fla.); and *United States v. Wilfred Antoine* (S.D. Fla.).

### Background & LBS Business Structure

11.     LBS Tax Services ("LBS") began in 2008 as a tax return preparation business in Orlando operated by Walner Gachette. In 2011, Gachette began franchising the LBS name to his employees to broaden his revenue base.

12.     In 2010, Gachette met Stinson at a party and pitched the LBS tax preparation business to him. Gachette told Stinson that by working for LBS, Stinson could earn more money in five months than he could make in an entire year. Enticed by Gachette's pitch, Stinson applied for a position at LBS on October 27, 2010. Subsequently, Gachette hired Stinson as a District Sales Manager ("DSM") at one of his LBS stores in Tampa.

13.     To become a DSM, Stinson entered into an agreement titled "Independent Contractor Agreement" with Loan Buy Sell, Inc., where he agreed to pay Gachette $5,000, and to manage one of Gachette's LBS locations in Tampa. In exchange, Stinson received, among other things, 25% of each tax preparation fee collected by the LBS location where he served as a DSM.

14.     Stinson, through Nation Tax Services, LLC, became an LBS franchisee in 2011. According to Stinson, he paid Gachette a fee of $15,000 for his first LBS office in Tampa and an additional fee for LBS marketing.

15.     LBS franchise costs include a $5,000 franchising fee, $5,000 for marketing, and $50 "or more" in "service bureau" and "LBS transmittal" fees for each tax return filed. The

4

terms disguise the nature of these fees from customers—there is no "service bureau," nor is there any "transmittal" cost. In 2013, these two fees combined totaled $74 for each tax return filed. These payments are all made to Gachette, and do not include other miscellaneous expenses that a franchisee incurs, and which the franchise agreement requires be paid by the franchisee, such as payroll, renting office space, equipment, supplies, and utilities.

16. Essentially, the franchise fee paid by Stinson (and other LBS franchisees) was for "buying" a zip code from LBS, as Gachette limits LBS franchisees to two stores per zip code. Gachette recommends zip codes to franchisees where he believes new LBS stores should be opened based on demographic studies. LBS seeks to have most, if not all, of its offices in areas with lower income taxpayers.

17. Franchisees, including Stinson, are required to use (and pay for) the LBS advertising and marketing created by Gachette. Franchisees select a marketing package that may include, among other things, business cards, flyers, and yard signs.

18. In 2012, Stinson operated only the Tampa LBS store location that he purchased in 2011. But he quickly expanded. By 2013, only two years after starting his franchise, Stinson opened 11 additional LBS locations (for a total of 12 locations) that extend beyond Tampa, to Georgia, North Carolina, and Alabama. According to Stinson, he paid a total of $110,000 for the additional 11 LBS stores (a $5,000 franchise fee and $5,000 marketing fee per store).

19. To expand its franchise rapidly, LBS lures prospective employees with promises of wealth and possible rapid advancement to the franchisee level. One recruiting advertisement for LBS uses a graph to show that for 4 months of work, LBS employees have the following earning potentials:

On-Site job training / Rapid advancement opportunity / Complimentary company cell phone while employed / Most be self-motivated/ Will be IRS certified



Tax Preparer | $5,000 | $10,000
Office Manager | $10,000 | $15,000
DSM | $25,000 | $66,000
Single Office Owner | $90,000 | $160,000
Dual Office Owner | $200,000 | $400,000
**IN 4 MONTHS**

**Stinson's LBS Franchise Operation**

20.     Each of Stinson's individual LBS stores is managed by a District Sales Manager ("DSM"), each of whom works for Stinson. DSMs, in turn, oversee office managers, tax return preparers, marketers (employees whose sole job is to solicit customers), and other LBS employees. The chart below shows the hierarchical structure of Stinson's LBS franchise.



21.    The DSMs and the tax return preparers that Stinson employs are not required to have any tax return preparation experience or knowledge of federal tax laws. Rather, the focus is on finding potential employees who have "customer service" experience.

22.    According to LBS, an LBS tax preparer's job is "60% outside marketing and 40% tax filing." LBS's emphasis on marketing, rather than tax return preparation, is apparent.

23.    DSMs enter into contracts similar to the franchise agreements described above. Loan Buy Sell, Inc. is a party to these contracts and, generally, so is the franchisee. DSM contracts provide that payments are made to the DSM based on the number of customers at the DSM's store; the more customers that a store secures, the greater the financial benefit to the DSM, including a $3,000 bonus if the store secures more than 500 customers. DSMs are also required to pay a fee, varying from $2,500 to $5,000 or more. The fee amount that a DSM contributes is dependent on LBS's classification of the DSM as a 15 percent, 25 percent, 70 percent, or other percentage stakeholder in the store that the DSM manages.

24.    After entering into these DSM agreements with Loan Buy Sell, Inc., and the franchisee, DSMs, including Stinson's DSMs, hire tax return preparers. Stinson's DSMs, are purportedly required to train their tax return preparers based on the purported training that the DSMs received from Stinson and from the LBS "training" in Orlando.

25.    Stinson and his DSMs also hire what they call "marketers" to solicit business on behalf of LBS.

26.    Stinson's LBS franchise uses tax return preparation software selected by Gachette, which automatically deducts the customers' tax return preparation fees from the customers' tax refunds. By mandating that LBS's fees be deducted from refunds rather than requiring payment when the tax return is prepared, Gachette effectively requires that LBS

7

prepare tax returns for customers that result in the customer receiving a tax refund, even in instances where legally the customer is not due a refund.

### LBS Tax Services' "Training" and Lack of Quality Control

27. LBS does not provide any substantive tax law training. Gachette and other LBS-affiliated individuals provide week-long training to LBS franchisees and DSMs annually at an LBS facility in Orlando. This training focuses on LBS policies, particularly how to market to potential customers and solicit business, how to manage employees, and how to use the tax return preparation software.

28. Gachette holds frequent meetings and conference calls with franchisees and DSMs. These meetings or calls may discuss, among other things, LBS policies, fees, and marketing. Gachette also provides copies of LBS's training and policy materials to franchisees and DSMs who attend these meetings, in addition to having franchisees and DSMs give presentations. Gachette emails (or directs his assistants to email) the LBS training and policy materials to franchisees and DSMs to ensure that anyone who does not participate in the in-person training or other meetings in Orlando has access to his training materials and copies of LBS's policies.

29. Stinson and his DSMs train the tax return preparers employed at Stinson's individual LBS stores. This training focuses on marketing, data entry to prepare tax returns, and how to charge related fees to customers in accordance with LBS's policies.

30. Gachette, Stinson, and LBS actually train DSMs and tax return preparers how to prepare tax returns fraudulently in order to falsely and improperly maximize customers' tax refunds. Stinson's DSMs and tax return preparers are specifically trained to increase the tax return preparation fees charged to LBS customers as they increase the customer's bogus refund.

8

31.    For example, the DSM of the Stinson-owned LBS store at 5135 Adanson Street, Suite 500, Orlando, Florida, told the IRS that he attended DSM training in Orlando with about 200 other individuals. The DSM explained that Walner Gachette was the primary trainer and that the training was the same training that he received from Stinson. The DSM then stated that he was trained at the LBS training in Orlando to get to the "perfect" number. The DSM expounded, explaining that he was trained to maximize the Earned Income Tax Credit ("EITC") by inflating customers' income, for example to income of $14,000, in order to maximize the customer's refund and generate more LBS fees.

32.    LBS also provides instruction sheets to DSMs and tax return preparers that direct the preparers to input specific information into the tax preparation software to create the maximum bogus refund for customers. LBS preparers follow the instruction sheet to report customers' income within a specific range on their tax returns, even if the customers' actual income and circumstances (married, having dependents) that they provide to the preparer conflicts with what the preparer inputs into the software. By following these instruction sheets, LBS generates bogus refunds that customers are not entitled to. One such instruction sheet, frequently taped to the preparer's desk or on a wall next to the preparer's computer, indicated which boxes to check on the Earned Income Tax Credit checklist (IRS Form 8867) in order to make it appear as though the preparer complied with the "due diligence" requirements (discussed in more detail below) necessary to claim the credit (regardless of the information provided by customers and whether the customers actually qualify for the credit).

33.    One LBS instruction sheet is brazenly captioned "Magic numbers." Preparers follow the instruction sheet, fabricating deductions on a Form 1040 Schedule A or creating bogus income or expenses on a Form 1040 Schedule C. The magic numbers sheet identifies the

magic numbers as "16000-18000," and states that "anything lower then this you try to add income to get as close as possible" and "anything higher then this you try to take away income to get as close as possible."[1] The magic numbers sheet includes an example, for a customer who earned $3,000 in wages, instructing the LBS tax preparer in such a situation to "input an income of 10000 on sch c" in order to falsely report the customer's income as $13,000. The sheet also instructs the preparer to report unemployment income as Form W-2 wages. A similar LBS instruction sheet includes the following: "**Magic range 16,000 to 18,000**"; "If made less than 10,000 **goal is to increase income so client to get more money** (add forms to get them more money) add Schc"; "**Made more than 24,000 you have to take income out so that you can get client more money.** (add deductions) 2106, SchA." (emphasis added.) The purpose of manipulating a customer's income in this manner is to falsely increase the amount of the Earned Income Tax Credit.

    34.    An LBS franchisee, Douglas Mesadieu, when deposed by the City of Orlando on August 26, 2013, testified that the "magic numbers would be how you can get – it's numbers where you can get the most amount for your client... [W]orking with numbers every day, you will know how to get your clients the max, you know how to get the least." Mesadieu further testified about "pushing numbers" to avoid detection from the IRS:

> A lot of when I spoke about pushing numbers, you don't want to be in the sweet spot every time. You don't want to – because that's a – basically, I mean, that's a red flag. You cannot be in a sweet spot every time, so you know – you're aware of your sweet spot, and you don't want to put a return where your client is getting the max every time because it would implement (sic) that you have a pattern. It would implement that something is wrong. Sweet spot is just for people to actually know and understand what not to do on certain circumstances, or what they can do on other circumstances.

---

[1] All quotations in this complaint are copied exactly as they appear on the source document, including any spelling, punctuation, typographical, or grammatical errors.

35.   Stinson also provides scripts directing his employees on how to interact with customers and potential customers. One LBS script informs customers that they will be receiving a refund, although not all customers legally qualify for a refund:

**SCRIPT:**

There are three things that I am going to do for you today

1.   I'm going to enter you information into the system
2.   I will tell you how much your refund will be and
3.   I will look for more forms and ways to get you more money legally, ok?

36.   Stinson and LBS fail to teach Stinson's DSMs and tax return preparers crucial elements related to basic tax return preparation. For example, they provide no genuine instruction on the legal requirements to claim the Earned Income Tax Credit and the related due diligence requirements, procedures for detecting fraudulent Forms W-2, and the methods to question customers who provide suspicious, false, or fraudulent information. To the contrary, Stinson and LBS affirmatively instruct Stinson's DSMs and preparers on how to prepare returns that improperly claims bogus refunds based on false claims, credits, and deductions and to maximize the fees extracted from those refunds.

37.   Gachette and LBS franchisees and employees give presentations to DSMs at the training in Orlando. DSMs are shown a power point presentation titled "Top 10 Things District Sales Managers Need to Know." The top ten list does not include any training on tax law. The power point focuses on marketing, hiring employees, interacting with customers (including selling tax return preparation to "hesitant" customers through scripts and "rebuttals"), how to maintain and organize files, and what to wear and not wear in the office.

11

38.     The scripts to talk to customers are the primary focus of the training provided to LBS employees. Stinson and LBS require their employees to memorize the scripts to solicit customers face-to-face and over the phone, and when preparing tax returns and attempting to coerce customers to agree to the inclusion of additional (and improper/false) IRS forms with, and bogus claims on, their tax returns. The purpose of these scripts is to solicit customers and, once those customers have come in the door, to run up the tax return preparation fees by attaching forms to the return at an additional charge to the customer. LBS includes bogus claims, credits, and deductions on these forms to generate a higher refund for the customer, and uses this higher refund to justify its additional tax return preparation fees.

39.     As part of the training session, LBS gives DSMs, a "test." The majority of the "test" and training is dedicated to marketing and soliciting business. The "test" also addresses LBS policies, such as how to maintain customer files and the fact that LBS's tax return season "begins on December 26th."

40.     The training questions in the LBS "test" focus on data entry in the Drake software (the provider of the tax return preparation software that LBS licenses and uses to prepare LBS customers' tax returns) and, in particular, how to input information on the forms that will generate the maximum (and bogus) refund for customers.

41.     To the extent that the test addresses tax return preparation, the questions are very basic and, not surprisingly, the acceptable answers are not thorough and, occasionally, entirely incorrect.

42.     The LBS "test" lists "Identification, Social Security Card, W-2, 1099" as the documents that a customer is purportedly required to provide to have their tax return prepared.

12

43.     Stinson's DSMs, in turn, are purportedly required to train the tax return preparers at their stores. However, the top ten list power point presentation's only slides pertaining to training focus on marketing and Drake software. For example, the first slide regarding training, captioned "How to Train," discusses teaching the "Appointment setting 'on-the-spot' script," "Telephone script," and "Presentation script" to employees. There is no instruction on how to convey to employees even basic tax law concepts, how to explain IRS forms such as a 1040, or how to train tax return preparers to actually prepare tax returns.

44.     Stinson and LBS also train Stinson's DSMs and preparers how to use Drake software (the provider of the tax return preparation software that LBS licenses) to prepare tax returns. However, Drake software does not train preparers on tax law, and the training is limited to data entry and practice tax returns so that preparers know where to enter information in the software. Drake software itself does not provide in-person training.

45.     Incredulously, Gachette claims that the IRS, not he and LBS, is responsible for providing tax training to LBS franchisees like Stinson and tax return preparers, and that it is up to the IRS and Drake software to train LBS employees on how to prepare tax returns. However, the IRS and Drake software do not train LBS employees on tax law or proper tax return preparation, nor is it the IRS's duty to train LBS employees how to prepare honest, accurate tax returns. That is LBS's responsibility, which it is completely and utterly failing to meet.

46.     The IRS requires that individuals applying for an Electronic Filing Identification Number ("EFIN"), such as LBS franchisees (including Stinson) and DSMs, complete an application and submit to a background check. The IRS does not provide training on tax law or tax return preparation in connection with its EFIN application. The requirements to obtain an

EFIN are available at: http://www.irs.gov/Tax-Professionals/e-File-Providers-&-Partners/Become-an-Authorized-e-file-Provider.

47.    An EFIN is a unique number that clearly identifies the authorized provider and the location where the return was prepared. Before a person may prepare and electronically transmit tax returns for customers, he or she must obtain authorization from the IRS to become an authorized provider. Every authorized provider must apply for and receive an EFIN from the IRS. The EFIN requirement is not a means for the IRS to "train" applicants on tax law or how to prepare tax returns.

48.    DSMs serve as the Electronic Return Originator ("ERO") for the stores they manage. ERO is an Internal Revenue Service designation for the person or entity that electronically submits tax returns on behalf of customers. EROs are identified by their registered EFIN and are responsible for preparing and filing with each tax return an IRS Form 8879, "IRS e-file Signature Authorization." Form 8879 is a signature authorization for an e-filed return filed by an ERO on behalf of a customer.

49.    IRS Publication 1345 requires that an ERO "be diligent in recognizing fraud and abuse, reporting it to the IRS and preventing it when possible." Stinson and LBS conduct no meaningful quality control or oversight over their tax return preparers, much less act diligently to prevent the fraud and abuse that is undertaken with respect to the preparation of customers' tax returns. Indeed, fraudulent return preparation is encouraged and flourishes at many LBS stores.

50.    The only supposed quality control that LBS and Stinson conduct is purportedly having "Area Managers," also known as "Area Developers," conduct occasional reviews of other LBS Tax Services offices. These reviews consist of making sure that employees are dressed properly, that customer files are stored properly, that the "presentation script" and various "cheat

Case 6:14-cv-01534-ACC-T_S   Document 1   Filed 09/23/14   Page 15 of 50 PageID 15

sheets" (such as the earned income tax credit "cheat sheet" that lists the answers that must be

input into Drake software to complete to claim the Earned Income Tax Credit for a client) are

taped to desks, and that the "forms order" cheat sheet (listing the order of forms that must be

signed and placed in a customer's file) is posted on the wall. The reviews also purportedly

require the Area Manager to review up to five customer files for quality control; however, the

Area Manager does not review whether the customers' tax returns were properly prepared, but

only whether certain forms are maintained in the files.

### LBS Tax Services' "Guerilla Marketing"

51.     Stinson and LBS solicit customers through what Gachette calls "Guerilla

Marketing." "Guerilla Marketing" involves misleading advertising and aggressive in-your-face

individual sales pitches, targeted at low income individuals. The purpose is to get as many

potential customers in the door, prepare their tax returns, and prepare and attach to their tax

returns additional and unnecessary forms containing bogus claims and credits, under the guise

that LBS is doing so in order to legally increase the customer's tax refund.

52.     Stinson and LBS charge the customer exorbitant fees for preparing the return, for

each form prepared and attached to the return, and for filing the return. LBS makes fraudulent

claims on these forms, in order to improperly increase customers' refunds. LBS then falsely tells

the customers that these forms legally increased the customers' refunds, and charges higher fees

due to the additional forms and the higher refund that LBS claimed. These fees are all deducted

from the customer's tax refund, often without the customer being told the amount that LBS

actually charged for preparing the tax return.

53.     "Guerilla Marketing" begins long before the tax filing season begins. LBS

advertising focuses on the Earned Income Tax Credit, with street signs, flyers, and business

cards that simply state, for example, that a potential customer can receive "$3169 per child" from the IRS and listing an LBS phone number to call.

54.     LBS instructs its employees to approach potential customers, ask whether they have children, hand out business cards, put up yard signs, and lure the potential customers to the LBS stores with promises of large refunds. This marketing occurs predominantly at large-scale retailers and grocery stores (marketers are specifically directed to solicit business at Wal-Mart), dollar stores, apartment complexes, public plazas, and large public events where LBS believes it can find potential customers who fit the low-income demographic that it targets. LBS has also used radio ads, automated telephone calls, flyers on parked cars, billboards, social media, and letters or mailers to previous or potential customers.

55.     LBS's "Guerilla Marketing" is so aggressive that the LBS franchise agreement anticipates and accounts for the related fines that are inevitably imposed against LBS's stores by cities and municipalities for violations of local ordinances, particularly regulations pertaining to signs and advertising placed alongside streets. The agreement provides that the first $500 in fines are paid by the franchisee, with any additional amounts paid by DSMs.

56.     DSMs are instructed that if the "city comes to your office, you should apologize and beg; say you weren't aware of the rules," and then go put out "200 yard signs 3 miles away from your office in each direction" at midnight. If a DSM receives a "letter before February 14th saying you have to go to court," the DSM is instructed to "call the courthouse, tell them you have an emergency and can come to court any day in March." The purpose of this is to avoid going to court until LBS's tax preparation and filing season is effectively over.

57.     Stinson also recruits and employs individuals, referred to as marketers, whose sole job is to solicit customers.

58.    LBS provides scripts to marketers (in addition to managers and tax return preparers) on how to solicit customers. One script contains general introductory language, with three variations (depending on the date) used to schedule an appointment for the customer to have his or her tax return prepared. In all three variations, the script begins:

"Hi, I'm John a tax preparer. **This year the IRS is giving $3000 dollars    per kid.** What's your name? How many kids do you have?"

[The script uses the answer of two children as the example.]

**"Perfect, I can get you $6000 to $7000 dollars legally."**

From December 6 to December 26, before the tax year is even over, the script concludes:

"Do you have you last paycheck stub?"

If the customer says no, the script continues: "OK, What's your name and number; I will have my secretary give you a call after Christmas to give you directions to the office one hour before."

From December 26 to January 8, the script concludes:

"Do you have you last paycheck stub?"

If the customer says yes, the script continues: "I can do your taxes with that, what time and date can you come to my office?"

From January 8 to March 14, the script concludes:

"Do you have your W2?"

If the customer says yes, the script continues: "What time and date works best for you to come to my office?"

(emphasis added.)

59.    Of course, the IRS does not "give" taxpayers $3,000 per child. Whether a taxpayer is entitled to a credit, such as the Earned Income Tax Credit or Child Tax Credit, and the amount of the credit that the taxpayer can claim, depends on numerous factors, including

whether the child lives with the taxpayer, whether the taxpayer financially supports the child, and the age of the child.

60.    LBS also provides similar scripts to tax return preparers and administrative staff at each store.

61.    Instead of focusing on honest, accurate tax return preparation, LBS's business model is result-oriented. LBS instructs preparers to "SELL ON FEAR!" and to "ALWAYS try to get the customer more than they received the last year filed taxes." LBS's power point presentation at its training session reiterates the script that preparers are repeatedly taught: "'If you agree I will leave the forms, If you don't I will take them off' – BUILDS TRUST!" If a customer hesitates, preparers are told to keep reiterating the portion of the script about how each form will get the customer more money from the IRS, and if the customer appears ready to walk away, preparers are instructed to get a DSM to help convince the customer to agree to the LBS's return preparation.

62.    LBS employees speaking with potential customers over the phone are instructed to entice the customer by deceptively declaring how much money LBS can get refunded to the customer. For example, if a potential customer questions whether an LBS sign, business card, or radio ad was correct in saying the potential customer could get a tax refund of "$3169 per child," the employee is instructed to respond that the potential customer "I can get this much per child," ask how many children the potential customer has, and then tell the customer that "I can get you anywhere from 6-8 thousand" or "I can get you anywhere from 8-9 thousand," depending on whether the customer has 2 or 3 children. If the potential customer responds by questioning whether there is an income limit for the child credit, the employee is instructed to say that LBS

18

"specialize[s] in maximizing your refund so come on in and we will show you exactly what you are entitled to."

63.    The LBS scripts setting forth what employees are required to say upon completing customers' tax returns (or, more specifically, the Form 1040) are egregious and show a blatant disregard of the law. Once an LBS employee has completed the Form 1040, he or she is instructed to say to customers:

> "At this time I am getting you back $ [amount]. Ma'am or Sir, I can search for more forms to get you more money legally. Each form I use will cost you more but you get more money. For instance, I see I can get you an extra $3000 by using 7 more forms and each form cost[s] about $75.00. At the end I will let you know how much your refund will be, minus our fees. If you agree I will leave the forms on, if you don't agree, I will take them off."

64.    LBS cannot legally "get" a customer $3,000 by "using forms" (for example, the 7 forms in the above script). Individuals receive a refund if it is legally owed and based on the honest reporting of facts, not, as is the case with LBS's tax return preparation, by adding to tax returns forms that do not apply and that customers do not understand. LBS entices customers with the possibility of a bigger (albeit fraudulent) refund based on LBS's addition of forms to customers' tax returns but, in reality, a form or schedule applies or does not apply and must be attached to a return only based on customer-specific facts or circumstances.

65.    LBS's tax return preparation is result-oriented, rather than being honest and accurate. LBS's tax return preparation is based on maximizing LBS's own profits by drawing customers into a web of deception with promises of money, which comes in the form of bogus refunds issued by the U.S. Treasury as a direct result of the fraudulent claims made on LBS-prepared tax returns.

66.    LBS primarily solicits business using deceptive marketing focusing on the Earned Income Tax Credit, particularly as it relates to claiming dependents. During the 2012 filing

season, in addition to the yard signs which read "Tax Refund $3094.00 per child," LBS also

passed out the following business cards to potential customers:



67.     LBS's advertisements regarding the Earned Income Tax Credit are misleading, at

best, because the amount of the credit depends on several factors, such as income, marital status,

and whether the child actually qualified as a dependent. LBS's advertisements simply recite the

maximum amount of the credit that a qualifying taxpayer may be eligible to receive per child

with no mention, let alone explanation, of the criteria that must be met to qualify for such an

amount. Rather the advertisements clearly suggest that if you have children you will receive

refunds of $3,094 for one child and $5,112 for two children. Moreover, preparing tax returns

using a taxpayer's pay stub, as advertised, rather than a Form W-2, violates IRS regulations.

And, of course, the IRS does not issue a "same day tax refund."

68.     LBS effectively offers guarantees to its customers that they will receive refunds.

LBS's advertising clearly suggests that customers with children will receive a refund. Some of

20

the ads specifically refer to "EIC," and for those that do not, it is evident, based on the specific amount identified in the ads and the income demographic that LBS targets, that the approximately $3,000 "per child" is due to the Earned Income Tax Credit.  In addition, the "three things that I am going to do for you today" script that LBS requires employees to memorize and recite explicitly states, "I will tell you how much your refund will be."  Guaranteeing the payment of any tax refund or the allowance of any tax credit violates 26 U.S.C. § 7407(b)(1)(C). LBS's tax return preparation practices ensure that customers do receive a refund, frequently based on bogus claims for the Earned Income Tax Credit.

### Stinson's Fraudulent Tax Preparation Activity

69.     Stinson and those acting in concert with him and at his direction have created and maintained a business environment and culture of greed at Stinson's LBS stores that expressly promotes and encourages the preparation of false and fraudulent federal income tax returns in order to maximize corporate and individual profits. By doing so, Stinson and LBS are able to line their pockets with the ill-gotten gains of fraudulent tax preparation—all at the expense of their customers and the United States Treasury.

70.     Many of LBS's customers have low incomes and are unsophisticated with respect to tax law and tax return preparation. Customers often have no knowledge that LBS prepares and files fraudulent tax returns on their behalf. For others, LBS preparers—with Stinson's consent and urging—mislead customers about the law, particularly with respect to various credits and deductions, and by promising them thousands of dollars of (illegal) refunds to coerce them into hiring LBS to prepare their tax returns. Stinson benefits by receiving a significant portion of LBS customers' fraudulently obtained refunds that they retain through fees.

21

71.     Stinson engages in, and instructs, directs, assists, advises, encourages, and causes his managers and preparers to engage in, illegal practices. These practices include, but are not limited to:

    a.     Making fraudulent claims for the Earned Income Tax Credit and circumventing due diligence requirements;

    b.     Fabricating Form Schedule C businesses and related business income and expenses;

    c.     Fabricating Form Schedule A deductions, including but not limited to, deductions for unreimbursed employee business expenses;

    d.     Falsely claiming education credits to which his customers are not entitled;

    e.     Charging deceptive and unconscionable fees; and

    f.     Failing to provide customers with a copy of their competed tax return.

<u>a. Earned Income Tax Credit Fraud and<br>Failure to Comply with Due Diligence Requirements</u>

72.     Stinson and many of his managers and tax return preparers prepare tax returns that include fraudulent claims for the Earned Income Tax Credit (EITC) often based fabricated business income and/or expenses.

73.     The EITC is a refundable tax credit available to certain low-income working people. The amount of the credit is based on the taxpayer's income, filing status, and claimed number of dependents. The requirements for claiming the EITC are set forth in I.R.C. § 32 and the accompanying Treasury Regulations.

74.     Because the EITC is a refundable credit, claiming an EITC can, in certain circumstances, reduce a taxpayer's federal tax liability below zero, entitling the taxpayer to a payment from the U.S. Treasury.

75.    Due to the method used to calculate the EITC, an individual can claim a larger EITC by claiming multiple dependents and, for certain income ranges, individuals with higher earned income are entitled to a larger credit than those with lower earned income. The amount of the credit increases as income increases between $1 and $13,050, and decreases as income increases beyond $17,100. Some tax preparers who manipulate reported income to maximize the EITC refer to this range of earned income corresponding to a maximum EITC as the "sweet spot" or "golden range." For tax year 2012, the maximum EITC was $5,891 and was available to eligible individuals with three dependent children who earned income between $13,050 and $17,100.

76.    Because of the way the EITC is calculated, reporting more income, up to a certain point, allows customers to receive a larger refundable credit. Similarly, claiming losses to offset higher income to decrease the total reported income and to fall within the "sweet spot" allows customers to claim a larger refundable credit.

77.    To solicit business, LBS uses enticements of higher refunds based on the number of children that a potential customer has.

78.    Stinson, and many of his managers and preparers acting at his direction and with his knowledge and consent, falsify information to claim the maximum EITC for customers. Unscrupulous tax return preparers at LBS exploit the rules by claiming on their customers' returns phony Form Schedule C businesses and income and/or expenses. Consistent with the "magic numbers" instruction sheet, to bring the customer's reported earned income within the "sweet spot" for the EITC, and depending on a customer's actual income, LBS preparers inflate or fabricate Schedule C income to fraudulently increase customers' reported earned income, or

claim bogus Form Schedule A or Schedule C expenses to fraudulently decrease customers' reported earned income.

79.    Reporting bogus income not only improperly enables LBS to falsely claim the EITC, but to fraudulently claim other credits as well, including the Child Tax Credit and American Opportunity Tax Credit.

80.    Form Schedule C fraud is a means by which unscrupulous tax return preparers, like many of those at LBS, manipulate customers' income in order to obtain bogus refunds based on fictitious claims for the EITC and other credits. Because of the amount of the EITC credit, these preparers frequently charge higher fees in connection with their preparation of bogus Forms Schedule C. Of the fees that LBS charges per IRS form, it charges $250 or more for a Form Schedule C, the most for any form.

81.    Because of the potential for abuse in claiming the EITC, Congress has authorized the Secretary of the Treasury to impose "due diligence" requirements on federal tax return preparers claiming the EITC for their customers. *See* 26 U.S.C. § 6695(g). These "due diligence" requirements obligate the tax return preparer to make "reasonable inquiries" to ensure the customer is legitimately entitled to the EITC. The tax return preparer may not "ignore the implications of information furnished to, or known by, the tax return preparer, and must make reasonable inquiries if the information furnished to the tax return preparer appears to be incorrect, inconsistent, or incomplete." *See* 26 C.F.R. § 1.6695-2 (2011). Tax return preparers must also document their compliance with these requirements and keep that documentation for three years. *Id.*

82. To document compliance with the due diligence requirements, tax return preparers must complete either the "Paid Preparer's Earned Income Credit Checklist" (Form 8867) and record and maintain other documentation verifying customer eligibility for the EITC.

83. As mentioned above, Stinson and LBS provide their managers and preparers with specific instructions or cheat sheets that provide predetermined answers to input into the Drake software to claim the EITC on customers' returns, and dictate what boxes to check on the IRS Form 8867, "Paid Preparer's Earned Income Credit Checklist." These instructions – and the predetermined answers – demonstrate that the actual information (if any) provided by customers is disregarded by preparers, who simply answer the questions in the manner that LBS instructs in order to claim the EITC for customers who are not actually eligible for the credit (or for the inflated amount claimed by LBS):



EIC 2 NOTES:

SITUATION 1:
-W2 taxpayer: click "yes" for "Does the income appear to be sufficient to support the taxpayer and qualifying children. ......."
- click "not applicable" "taxpayers with self-employment income.

SITUATION 2:
-Schedule C taxpayer: click "yes" for "Does the income appear to be sufficient to support the taxpayer and qualifying children.. ......"
- Question 2.) Fill out how many years the business has been in existence
- Question 3.) Fill in "self"
- Question 4.) Click "no"
- Question 4b.) Type "by income only"
- Question 5.) Click "yes"
- Question 5a.) Click "log books"
- Question 6.) "No" if there are no 1099-misc forms to support income, "yes" for 1099 taxpayer
- Question 6b.) "Yes"
- Question 7.) "Yes"
- Question 8.) "Yes"
- Question 9.) "No"

84. A portion of a similar LBS instruction sheet is below (the Drake software questions are followed by the predetermined answers in bold):

25

EIC2 INCOME (NOT A SCHC)
DOES THE INCOME APPEAR TO BE SUFFICIENT TO SUPPORT THE TAXPAYER AND QUALIFYING CHILDREN? CHECK YES
TAXPAYERS WITH SELF-EMPLOYMENT INCOME: CHECK NOT APPLICABLE
EIC2 INCOME (W/SCH C)
DOES THE INCOME APPEAR TO BE SUFFICIENT TO SUPPORT THE TAXPAYER AND QUALIFYING CHILDREN? CHECK YES
HOW LONG HAVE YOU OWNED YOUR BUISNESS? 1 YEAR
CAN YOU PROVIDE ALL DOCUMENTATION TO SUBSTAIATE YOUR BUISNESS? CHECK RECEIPTS OR RECEIPT BOOK
WHO MAINTAINS THE BUISNESS RECORDS? SELF
DO YOU MAINTAIN SEPARATE BANKING ACCOUNTS FOR PERSONAL AND BUISNESS TRANSACTIONS? CHECK NO
IF "NO" HOW DO YOU DIFFERNTIATE BETWEEN PERSONAL AND BUISNESS TRANSACTIONS AND MONETARY ASSETS? CASH LOG
WERE SATISFACTORY RECORDS OF INCOME AND EXPENSE PROVIDED? CHECK YES
IF "YES" IN WHAT FORM WERE THESE RECORDS PROVIDED? CHECK PAID INVOICES
FORM 1099-MISC NO/YES/YES/YES/NO

85.    Because the Forms 8867 EITC Checklists that Stinson's LBS stores generate are

based on instruction sheets providing pre-determined answers showing that customers are

eligible for the EITC, these forms, maintained in customers' files, appear to be complete,

accurate, and based on statements and documentation provided by customers. In reality, because

the answers are pre-determined, the only function of the LBS-completed Form 8867 EITC

Checklist is to give the illusion that LBS complies with the due diligence requirements.

86.    A closer review of LBS customer files reveals that Stinson, and many of his

managers and preparers utterly fail to comply with the due diligence requirements. Customers

are given an intake form to complete, which is comprised of several sections. The first few

sections request basic information such as name, address, social security number, filing status,

and dependents. The final section pertains to any business that the customer operated. Often

these intake forms are not fully completed by the customer, if they are marked at all.

87.    The LBS intake form apparently serves no other purpose than to give the illusion

that LBS is questioning its customers and complying with the due diligence requirements.

Frequently LBS preparers, rather than the customers, complete the form to support the claims that the preparer is fabricating on customers' tax returns.

88.    The conduct of Stinson and many of his managers and preparers shows an intentional disregard for the tax laws, and in particular for the due diligence requirements, and demonstrates their unwillingness to comply with the requirements. Not only does Stinson and many of his managers and preparers fail to adhere to the due diligence requirements, but they also purposely falsify information to maximize the EITC for their customers.

<u>b. Fabricated Form Schedule C Business Income and Expenses</u>

89.    Stinson and many of his managers and preparers also prepare tax returns reporting non-existent businesses on bogus Forms Schedule C. On some of these returns, LBS reports substantial income, but little or no expenses. On other returns, LBS reports substantial expenses, but little or no income. The determining factor is whether LBS needs to inflate a customer's income (or create income when the customer has none) to bring the  income within the EITC range or "sweet spot," or to lower the taxable income of a customer who has actual income (such as wages reported on a Form W-2) in order to either bring the income within the EITC "sweet spot" or simply to create a phony business loss to offset the customer's wages and fraudulently reduce the customer's income tax liability.

90.    Stinson and many of his managers and preparers also coerce customers to provide information that LBS can then use to fabricate claims on the customers' tax return. One LBS script, captioned "Schedule C," instructs preparers as follows: "if the person has a W-2 and made 5,000 or less ask if they have their own business give them examples of their own business (ex. hairstyling, nails, cutting grass)." Thus, based on LBS's suggestions, if a customer responds that they cut a friend's hair, or cut a family member's lawn, or cooked for a church event, LBS then

falsely reports that as a business on a Schedule C with bogus income and/or expenses in order to bring the income within the EITC "sweet spot" or to simply reduce the taxable income.

91.     During an interview with the IRS on August 6, 2013, one of Stinson's own DSMs (discussed in ¶ 31) confirmed that Stinson-owned LBS stores engage in Form Schedule C fraud. According to the DSM, he was trained to report the "perfect number" of income to maximize customer refunds, and, in turn increase LBS's fees.

92.     For example, on January 15, 2013, customer R.B. had her 2012 federal income tax return prepared at the Stinson-owned LBS store located at 5135 Adanson Street, Suite 500, Orlando, Florida. In 2012, R.B. earned wages of $5,406 as an employee. R.B. did not own her own business and did not tell Stinson's tax return preparer that she owned her own business. Notwithstanding, to increase R.B.'s EITC, and, in turn, LBS's fees, the tax return preparer fraudulently reported on R.B.'s 2012 tax return that R.B. owned and operated a business where she earned business income of $14,997 and incurred $3,049 of expenses. The preparer's fabrication resulted in R.B. receiving an inflated EITC of $5,891.

### c. Fabricating Form Schedule A Deductions

93.     Reporting bogus Form Schedule A deductions is another tactic commonly used by Stinson and many of his managers and preparers to fraudulently reduce customers' taxable income. As with bogus Schedule C business losses, the bogus Schedule A deductions are typically reported on the tax returns of customers who have over $24,000 in wage income reported on Forms W-2.

94.     Stinson and many of his managers and preparers often prepare tax returns for customers which include false claims for purported unreimbursed employee business expenses. Section 162 of the Internal Revenue Code governs trade or business expenses. These returns

28

often claim deductions for fabricated, fraudulently inflated, and/or non-qualifying business expenses. IRS Publication 529 (which is readily available and easy to understand) provides examples of qualifying business expenses, including "Union dues and expenses" and "Work clothes and uniforms if required and not suitable for everyday use." *See* IRS Publication 529 (2013) (available online at: http://www.irs.gov/publications/p529/ar02.html). Publication 529 also provides examples of expenses that do <u>not</u> qualify as business expenses, including "Commuting expenses," "Lunches with co-workers," "Meals while working late," and "Personal, living, or family expenses."

95.    One LBS script instructs the preparer to ask specific questions to customers:

<u>(SCHEDULE A QUESTIONS)</u>

-HOW MUCH DID YOU SPEND ON GAS?
- DID YOU ATTEND CHURCH? ( 10% TITHES) OR -DID YOU GIVE TO ANY CHARITIES?
-DID YOU PURCHASE ANY WORK UNIFORM(S)?
-DID YOU PURCHASE ANY WORK SHOES?
-DID YOU PURCHASE ANY TOOLS?
-ANY MEDICAL OR DENTAL EXPENSES?
-WHAT WAS YOUR CELL PHONE BILL?

If customers respond, for example, that they drove to and from work, Stinson and many of his managers and preparers then claim a non-qualifying expense for commuting on the customers' returns. Stinson and many of his managers and preparers thus push customers to provide information that Stinson and many of his managers and preparers can manipulate to make bogus claims on customers' tax returns.

96.    The LBS training "test" specifically instructs preparers that "Schedule A should only be used when the taxpayer has an outstanding income of 24,000 [dollars] or higher."

Stinson and many of his managers and preparers frequently report on Forms Schedule A that customers had qualifying expenses when the customer had no such expenses.

97.     In fact, the Stinson's DSM discussed in paragraphs 31 and 91 told the IRS that for those customers who have larger Form W-2 income, LBS trained him and approximately 200 other DSMs to use "ballpark figures" to reduce such customers' income and inflate those customers' refunds.

98.     Stinson and many of his managers and preparers also frequently report that a customer used a personal vehicle for a business purpose and that the customer drove tens of thousands of miles for work. In reality, the majority of this purported mileage is for commuting from home to work, which is not a qualifying vehicle expense. Stinson and many of his managers and preparers also inflate the actual mileage that the customer drives each day to and from work. Therefore, not only are Stinson and many of his managers and preparers claiming an improper, non-qualifying expense, but they are falsely inflating the mileage number in order to further increase the bogus deduction on customers' tax returns.

99.     For example, while in a Wal-Mart parking lot on or about January 22, 2013, T.W. and L.W. were solicited by one of Stinson's employees to go to LBS to have their 2012 tax return prepared. The married couple agreed and went to the Stinson-owned LBS store located at 5035 East Busch Blvd., Suite 3, Tampa, Florida, to have their tax return prepared. In 2012, T.W. and L.W. together earned $43,392. In such a situation, LBS's training cheat sheets call for a reduction of income to inflate the customers refund. Stinson's preparer did exactly that by falsely reporting on the Form Schedule A attached to T.W. and L.W.'s tax return that T.W. had driven 29,481miles for business purposes, resulting in an inflated unreimbursed business expense of $20,194. L.W. and T.W. told the IRS that they did not discuss these figures with the preparer and

did not tell the preparer about such expenses. By reporting these bogus unreimbursed business expenses, Stinson's preparer claimed a refund for T.W. and L.W. of $10,375. LBS's fee for this "service" was approximately $1,000.

100.    Similarly, customers E.M. and M.M. had their 2012 tax return prepared by Stinson's LBS store located at 2310 N. Nebraska Ave, Suite B, Tampa, Florida, on or about February 18, 2013. In 2012, E.M. and M.M. earned, together, $86,690. To inflate their refund, Stinson's preparer falsely claimed that E.M. drove his personal vehicle a total of 26,746 miles— an unreimbursed employee business expense of $14,844. E.M. and M.M. told the IRS that they only told the preparer the amount they spent on clothing for work and commuting mileage. The preparer's false claim resulted in E.M. and M.M. receiving an inflated refund.

101.    On or about February 8, 2014, Stinson's National Tax Services office at 2310 N. Nebraska Avenue, Suite B, Tampa, Florida, prepared customers P.C. and J.C.'s 2013 federal income tax return.[2] In 2013, P.C. and J.C. together earned over $41,000. To inflate P.C. and J.C.'s refund, LBS falsely claimed that P.C. and J.C. incurred unreimbursed employee business expenses for tools, cell phone use, uniforms, and for using their personal vehicle for business purposes. These claimed expenses totaled more $17,000 in unreimbursed employee business. Neither P.C. nor J.C. were aware that these expenses were claimed on their tax return and told the IRS that Stinson's preparer only discussed commuting mileage with them. LBS false claims resulted in an inflated refund of $5,458.

102.    On or around February 5, 2014, a married couple, M.M. and G.M., went to Stinson's Nation Tax Services store located at 5035 East Busch Boulevard, Tampa, Florida, to have their 2013 federal income tax return prepared. In 2013, M.M. and G.M.'s combined earned

---

[2] As explained above in paragraph 6, Stinson began doing business in 2014 under the name National Tax Services.

income was $51,973. The cheat sheets here again call for a reduction of income to inflate the customer's refund. Stinson's preparer claimed $15,587 in unreimbursed employee business on M.M. and G.M.'s 2013 tax return. M.M. and G.M. told the IRS that they were unaware such expenses had been reported on their return and that they only provided Stinson's preparer with copy of their Forms W-2, 1098, and 1099. As a result of these fabricated expenses, Stinson's preparer inflated M.M. and G.M.'s itemized deduction and claimed a bogus refund of $5,665 on their 2013 tax return.

### d. Bogus Education Credits

103.    Another practice at Stinson's LBS stores is fabricating education expenses and falsely claiming refundable education credits, including the American Opportunity Education Credit, on customers' federal income tax returns. Unlike many tax credits, a refundable tax credit entitles qualifying taxpayers to receive refunds even if they have no tax liability. Stinson and many of his managers and preparers routinely and repeatedly claim false education credits on the tax returns of customers who did not attend college and had no qualifying education expenses, in order to fraudulently reduce their customers' taxable income and generate a larger bogus refund (and increasing the fees that they charge to customers).

104.    For example, on customer R.B.'s 2012 tax return (discussed in ¶ 92), Stinson's preparer reported that R.B. was a student at South University in 2012 and incurred qualified educational expenses. R.B. did not attend college in 2011, did not incur any educational expenses, and was not aware that an education credit had been claimed on her tax return. The LBS preparer's false claim resulted in R.B. obtaining an American Opportunity Credit of $969.

### e. Deceptive, Unconscionable, and Undisclosed Fees

105.    Stinson's LBS stores charge unconscionably high fees to prepare tax returns, mostly through added, deceptive fees. These fees are typically charged without customers' knowledge.

106.    LBS intentionally deceives its customers regarding the fees charged for the preparation of tax returns.

107.    The LBS training "test" specifically instructs employees to tell potential customers who call LBS asking what the charge is for preparing a tax return to respond with: "$75. Would you like to set an appointment?" The "Telephone Script" instructing employees how to speak to a potential customer on the phone directs employees to respond to the question "How much do you charge?" with: "We charge $75. You do not have to pay us up front; it will be deducted automatically from your refund."

108.    However, the actual cost may actually be several hundred dollars or more, depending on the IRS forms and schedules attached to the tax return. LBS charges additional fees for each form (such as a Schedule C or a Form 8863 for an education credit) attached to the Form 1040 tax return. LBS charges separate fees for forms such as the electronic filing authorization (Form 8879) which is required for e-filing, the EITC qualifying child form (Schedule EIC), and the related EITC due diligence checklist (Form 8867), which must be completed in connection with a claim for the EITC. These fees result in a total tax return preparation fee much higher than the $75 advertised.

109.    LBS also has so-called "999 charge weeks." During these periods, Gachette and LBS franchisees encourage LBS stores to charge $999 – or "as much as possible," according to franchisee Douglas Mesadieu – for the preparation of tax returns that, at other times, would not

result in such high fees. The sole purpose of "999 charge weeks" is to maximize the amount of revenue generated by LBS stores, and the high fees charged during these periods are not based on the difficulty or amount of time in preparing customers' tax returns.

110.   Customers must also pay the "service bureau" and "LBS transmittal" fees, totaling $74, and fees to Drake software and EPS Financial (the refund processor) of $7 and $15 to $20, respectively, in 2013. Thus, for a customer to have LBS prepare and e-file a basic federal income tax return (which is the appropriate return for the majority of customers), the actual bare minimum is far more than the $75 advertised amount.

111.   The high fees (and fee structure, which encourages the addition of unnecessary and often improper forms and schedules to the Form 1040) are a strong incentive for LBS to prepare and file fraudulent returns claiming excessive refunds based on bogus claims and associated forms and schedules.

112.   Because LBS targets low-income individuals, the high fees frequently pose a significant financial hardship for its customers. Additionally, fees are unconscionable for the basic tax returns being prepared for these customers, who are often eligible for free tax return preparation and electronic filing elsewhere.

113.   Stinson and his LBS stores also routinely and intentionally fail to disclose to customers all fees charged. LBS trains its employees how to present forms to customers to sign, including a form acknowledging the fees charged, without allowing the customer to closely review or understand the forms they are signing. Alternatively, LBS tells customers one amount for fees and then later increases the fees without the customers' knowledge or consent. Customers are often surprised to learn that the refund requested on their return is hundreds if not thousands of dollars more than the refund amount that they received after the fees were deducted.

34

114. Stinson's DSM, discussed in paragraphs 31 and 91 above, told the IRS that he had actually changed the fee amounts that Drake software had computed to increase LBS's fees before the customer signed his or her tax return.

115. Customers often complain that they did not know in advance that they would be charged exorbitant fees. LBS provides its customers with the amount of the refund that they will be receiving, which is much less than the refund amount that was actually claimed on their tax return (which is not disclosed to customers at the time their tax returns are prepared). This is a recurring theme of complaints filed with the IRS and the Better Business Bureau, as well as local news reports regarding LBS locations across the country.

116. To the extent that customers are advised that additional fees may be charged per each additional form, they are not advised upon completion of the preparation of the tax return the total amount of those fees. If customers question the fee, LBS employees are instructed to tell the customer how much more money the preparer got the customer by adding additional forms to the tax return to increase the refund, and that, as the preparer stated in the initial "presentation script" each of those forms to get the customer more money back costs an additional fee.

117. LBS's fees are not paid by customers at the time of the preparation of their tax returns, but instead are subtracted from the customers' tax refund. By doing so, LBS is able to conceal from unsuspecting customers the actual amount that the customers pay to have their tax return prepared. Customers typically do not discover that LBS charged much more than the customers anticipated for the preparation of their tax return until the customers receive a refund that is much less than quoted by the tax return preparer because LBS had subtracted its high fees.

118. Tax refunds issued to customers are directed from the IRS to a third-party processor's bank account. The processor then deducts and transmits the fees owed to Gachette

and Stinson for preparing the tax returns. The remaining refund amount is then directed to the

customer, through direct deposit or check. The check issued to the customer makes no reference

to the amount of fees deducted, which makes it easy for LBS to conceal, inflate and/or lie about

its fees.

119.    For example, T.W. and L.W. (¶ 99) were charged approximately $1,000 to have

their 2012 federal income tax return prepared.

120.    Stinson and LBS's practice of charging unconscionable and undisclosed fees

violates consumer protection laws. The undisclosed and unconscionable fees also interfere with

the administration and enforcement of the internal revenue laws. Potential customers go to LBS

believing that they will be charged a reasonable fee for the honest and accurate preparation of

their tax return. Instead, LBS charges unconscionable fees (based on the inclusion of additional

forms and schedules that frequently make fabricated claims designed to fraudulently increase the

customers' refund), that are subtracted from customers' falsely inflated refunds, without full

disclosure to the customer. Such predatory behavior erodes consumer confidence in tax return

preparers and dissuades taxpayers from seeking professional assistance with the preparation of

their federal tax returns.

## Investigations and Lawsuits have Not Deterred Stinson

121.    Despite knowing of the widespread and pervasive fraudulent conduct surrounding

his tax return preparation business, the IRS's examinations of customers' tax returns, lawsuits

filed against LBS by the State of Texas and H & R Block, and the well-publicized complaints,

including those by the Better Business Bureau, online consumer protection sites, and various

local media outlets throughout the country, Stinson has not taken any meaningful steps to stop

the fraud.

36

122.    In fact, the only apparent change in 2014 is that several LBS stores began doing business under different names. Stinson now operate under the name Nation Tax Services. Many, if not all, are operated from the same locations where he operated his LBS stores. In actuality, nothing has changed.

123.    To the extent that Stinson claims that he does not know of the fraud committed by his LBS stores, his ignorance is deliberate, and he, in furtherance of his own greed, intentionally ignores and turns a blind eye to complaints documenting LBS's fraudulent practices.

124.    Stinson has little incentive to stop the wrongdoing because he directly profits from the misconduct at his LBS stores by taking a percentage of all gross revenues. Accordingly, Stinson promote a culture of greed that favors volume and profits over accuracy and integrity, and creates an environment where fraudulent tax return preparation and violations of federal tax laws flourish.

### Harm Caused by the Defendant

125.    Stinson's knowledge and encouragement of fraud at his tax return preparation stores, false and misleading statements directed to customers and potential customers, and culture favoring volume and profits over accuracy and integrity have harmed the public and the United States Treasury. These practices harm the public because Stinson and many of his managers and preparers prepare false or fraudulent tax returns that understate their customers' correct income tax liabilities and illegally cause customers to incorrectly report their federal tax liabilities and underpay their taxes.

126.    The fraudulent practices of Stinson and many of his managers and preparers harm the United States Treasury by causing lost tax revenue. Based on the IRS's completed examinations of tax returns prepared at Stinson's LBS stores for 2012 alone, the average tax

deficiency per examined tax return, and the total number of tax returns prepared at Stinson's

LBS stores during this period, the IRS estimates the tax loss caused by Stinson's LBS stores may

be $19 million or more.

127.   Stinson's customers have also been harmed because they relied on LBS to prepare

proper tax returns. Instead, customers' tax returns substantially understated their correct tax

liabilities after paying unconscionably high fees to have their tax returns prepared. As a result,

many customers, who are often low-income taxpayers, now face large income tax debts and may

be liable for sizeable penalties and interest.

128.   Customers are harmed by the unconscionably high and frequently undisclosed tax

preparation fees and related bogus fees tied to anticipated tax refunds. These fees are subtracted

from the erroneous refunds that result from LBS's fraudulent tax return preparation. When the

IRS conducts audits or examinations of customers and seeks repayment of these erroneous

refunds, the customers are liable for the repayment of those refunds. Not only do customers face

the hardship associated with repayment of erroneous refunds resulting from LBS's culture of

greed at others' expense, but customers may also have to repay the portion of the refund that

LBS subtracted for its high fees. Customers may also have to pay additional fees to other tax

return preparers who will file correct, accurate amended tax returns to correct the fraudulent tax

returns that LBS prepared and filed.

129.   Other customers are harmed by LBS's fraudulent practices because they have lost

or become ineligible for federal and/or state benefits due to the false claims that LBS made on

their tax returns.

130.   Stinson's misconduct further harms the United States and the public by requiring

the IRS to devote scarce resources to detecting the fraud and assessing and collecting lost tax

revenues from Stinson's customers. IRS employees have spent thousands of hours conducting audits or reviewing tax returns prepared by LBS and interviewing hundreds of customers. In addition, IRS employees have devoted still more time making compliance visits to various franchises. Consequently, identifying and recovering all lost tax revenues resulting from LBS's fraudulent and illegal activities may be impossible.

131.    Stinson's conduct also harms honest tax return preparers who refuse to engage in such illegal conduct. Honest tax return preparers unfairly lose business to LBS as a result of LBS's willingness to break the law. Customers often have their returns prepared at LBS because LBS promises the maximum refund, and delivers by fabricating claims and deductions on customers' returns.

132.    Finally, Stinson's misconduct harms the public at large by undermining public confidence in the federal tax system and encouraging widespread violations of the internal revenue laws.

133.    The harm to the government and the public will increase unless Stinson is enjoined because—given the seriousness and pervasiveness of his illegal conduct—without an injunction, Stinson is likely to continue enabling the preparation of false and fraudulent federal income tax returns for customers. The number of Stinson-owned LBS stores increased dramatically in just 2 years, going from one store in 2012 to 12 by 2013, and LBS's stated goal for total stores is 1,000 by 2016. An injunction will serve the public interest because it will put a stop to Stinson's illegal conduct and the harm that such conduct causes the United States and its citizens.

## Count I: Injunction under I.R.C. § 7407

134.    Section 7407 of the I.R.C. authorizes a district court to enjoin a tax return preparer from engaging in conduct subject to penalty under I.R.C. § 6694 or § 6695. Additionally, if the court finds that a preparer has continually or repeatedly engaged in such conduct, and the court further finds that a narrower injunction (i.e., prohibiting only that specific enumerated conduct) would not be sufficient to prevent that person's interference with the proper administration of the internal revenue laws, the court may enjoin the person from further acting as a tax return preparer. The prohibited conduct justifying an injunction includes, among other things, the following:

    a.    Engaging in conduct subject to penalty under I.R.C. § 6694(a), which penalizes a return preparer who prepares a return or claim for refund that contains an unreasonable position and the return preparer knew (or reasonably should have known) of the position;

    b.    Engaging in conduct subject to penalty under I.R.C. § 6694(b), which among other conduct, penalizes a return preparer who recklessly or intentionally disregards IRS rules or regulations;

    c.    Engaging in conduct subject to penalty under I.R.C. § 6695(g), which penalizes a return preparer who fails to comply with the statutory due diligence requirements;

    d.    Guaranteeing the payment of any tax refund or the allowance of any tax credit; or

    e.    Engaging in any other fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws.

135.    Section 7701(a)(36) of the I.R.C. defines tax return preparer to include not only the individual who physically prepares a tax return for compensation, but also anyone "who employs one or more persons" to prepare tax returns for compensation.

136.    Stinson, as shown above in paragraphs 1 through 133, is a tax return preparer who has repeatedly and continually prepared or submitted returns or portions of returns (or employed

40

or managed others who prepared or submitted returns or portions of returns) that contain unreasonable positions and substantially understate the liability for tax on the return. He advises, instructs, directs, and causes his managers, preparers, and employees to engage in tax fraud, and to prepare federal income tax returns asserting unreasonable, unrealistic, frivolous and fraudulent positions. Accordingly, Stinson knew (or reasonably should have known) of the unreasonable, unrealistic, frivolous and fraudulent positions.

137.    Stinson and those acting in concert with him and at his direction have continually and repeatedly engaged in conduct subject to penalty under I.R.C. § 6694 by preparing federal tax returns that understate his customers' liabilities based on unrealistic, frivolous and reckless positions. Stinson, through the actions described above, recklessly or intentionally disregards IRS rules or regulations.

138.    Stinson and those acting in concert with him and at his direction have continually and repeatedly engaged in conduct subject to penalty under I.R.C. § 6695. The Treasury regulations promulgated under I.R.C. § 6695(g) prohibit a return preparer from claiming the EITC without first conducting proper due diligence and documenting his or her compliance with the due diligence requirements. See 26 C.F.R. § 1.6995-2 (2011). Stinson advises, encourages, and causes his managers, preparers, and employees to circumvent these due diligence requirements and to ignore or disregard the information provided by customers.

139.    Stinson's failure to comply with the due diligence requirements for the EITC violates Treasury Regulations and his willingness to falsify information to obtain the EITC for his customers shows a reckless and/or intentional disregard of IRS rules and regulations.

140.    Stinson and those acting in concert with him and at his direction have continually and repeatedly prepared federal income tax returns that claim the EITC for customers where he

and those acting in concert with him and at his direction have not conducted, let alone documented, the required due diligence procedures.

141.   Stinson also fails to comply with I.R.C. §§ 6107 and 6695(a), which require that a tax return preparer provide a copy of the completed tax return to the taxpayer.

142.   Stinson's continual and repeated violations of I.R.C. §§ 6694 and 6695 fall within I.R.C. § 7407(b)(1)(A), and thus are subject to an injunction under I.R.C. § 7407.

143.   Stinson's continual and repeated fraudulent or deceptive conduct that substantially interferes with the proper administration of the internal revenue laws falls within I.R.C. § 7407(b)(1)(D), and thus is subject to an injunction under I.R.C. § 7407.

144.   Stinson and those acting in concert with him and at his direction have continuously and repeatedly guaranteed refunds to customers and guaranteed the allowance of tax credits, including but not limited to the EITC. This conduct falls within I.R.C. § 7407(b)(1)(C), and thus is subject to an injunction under I.R.C. § 7407.

145.   If Stinson is not enjoined from all tax preparation, he and those acting in concert with him and at his direction are likely to continue to prepare and file false and fraudulent tax returns.

146.   Stinson's continual and repeated conduct subject to an injunction under I.R.C. § 7407, including his continual and repeated fabrication of expenses and deductions, is so flagrantly illegal and so egregious that it demonstrates that a narrow injunction prohibiting only specific conduct would be insufficient to prevent Stinson's interference with the proper administration of the internal revenue laws. Accordingly, Stinson should be permanently barred from acting as a federal tax preparer, and from owning, operating, managing, controlling, licensing, franchising, or working for a tax return preparation business.

42

## Count II: Injunction under I.R.C. § 7408

147.    Section 7408 of the I.R.C. authorizes a district court to enjoin any person from engaging in conduct subject to penalty under either I.R.C. § 6700 or § 6701 if injunctive relief is appropriate to prevent recurrence of such conduct.

148.    Section 6701(a) of the I.R.C. penalizes any person who aids or assists in, procures, or advises with respect to the preparation or presentation of a federal tax return, refund claim, or other document knowing (or having reason to believe) that it will be used in connection with any material matter arising under the internal revenue laws and knowing that if it is so used it will result in an understatement of another person's tax liability. Under I.R.C. § 6701(c)(1), the term "procures" includes "ordering (or otherwise causing) a subordinate to do an act," as well as "knowing of, and not attempting to prevent, participation by a subordinate in an act."

149.    Stinson, through the actions detailed above in paragraphs 1 through 133, caused the presentation and preparation of false, fraudulent, and abusive tax returns and other documents. Stinson prepares, assists, and/or advises with respect to the presentation and preparation of federal tax returns for customers that he knows will understate their correct tax liabilities, because Stinson knowingly prepares, assists, and/or advises with respect to the presentation and preparation of returns claiming bogus expenses and deductions. Stinson procured and assisted the preparation of false and fraudulent tax returns by encouraging the filing of tax returns he knew were false or fraudulent, and by employing, training, and supervising tax return preparers engaging in tax fraud. Stinson's conduct is thus subject to a penalty under I.R.C. § 6701.

150.    In addition, Stinson is likely to continue violating the law absent an injunction. Tax return preparation is Stinson's primary source of revenue. To maximize that income, Stinson

instructs and directs his managers and preparers to prepare fraudulent returns. That fraudulent

conduct, in turn, gives Stinson a competitive edge over law-abiding preparers. It also provides a

means for Stinson to further exploit his customers by charging them unconscionably high fees,

while Stinson's fraud simultaneously and callously exposes his customers to possible civil and

criminal liability.

151.    If the Court does not enjoin Stinson, he is likely to continue to engage in conduct

subject to penalty under I.R.C. § 6701. Stinson's, and those acting in concert with him and at his

direction, preparation of returns claiming improper expenses and deductions is widespread over

many customers and tax years. Injunctive relief is therefore appropriate under I.R.C. § 7408.

### Count III: Injunction and Disgorgement under I.R.C. § 7402(a)
### Necessary to Enforce the Internal Revenue Laws

152.    Section 7402 of the I.R.C. authorizes a district court to issue injunctions, orders,

judgments, and decrees as may be necessary or appropriate for the enforcement of the internal

revenue laws.

153.    Stinson, through the actions described above in paragraphs 1 through 133,

including, but not limited to, intentionally understating his customers' tax liabilities, charging

unconscionable and undisclosed fees for the preparation of federal tax returns that intentionally

understate their customers' tax liabilities has engaged in conduct that substantially interferes with

the enforcement of the internal revenue laws.

154.    Unless enjoined, Stinson and those acting in concert with him and at his direction

are likely to continue to engage in such improper conduct and interfere with the enforcement of

the internal revenue laws. If Stinson is not enjoined from engaging in fraudulent and deceptive

conduct, the United States will suffer irreparable injury by wrongfully providing federal income

tax refunds to individuals not entitled to receive them.

44

155.   While the United States will suffer irreparable injury if Stinson is not enjoined, Stinson will not be harmed by being compelled to obey the law.

156.   Enjoining Stinson is in the public interest because an injunction, backed by the Court's contempt powers if needed, will stop Stinson's illegal conduct and the harm it causes the United States and to his customers.

157.   The Court should impose injunctive relief under 26 U.S.C. § 7402(a).

158.   Stinson's conduct, which substantially interferes with the enforcement of the internal revenue laws, caused the United States to issue tax refunds to individuals not entitled to receive them, and Stinson has unjustly profited at the expense of the United States by subtracting his exorbitant fees from those refunds.

159.   The Court should enter an order under 26 U.S.C. § 7402(a) requiring Stinson to disgorge to the United States the proceeds that Stinson and his businesses received for the preparation of federal tax returns that make false or fraudulent claims.

WHEREFORE, the United States of America prays for the following:

A. That the Court find that Jason Stinson has continually and repeatedly engaged in conduct subject to penalty under I.R.C. §§ 6694 and 6695, and has continually and repeatedly engaged in other fraudulent or deceptive conduct that substantially interferes with the administration of the tax laws, and that a narrower injunction prohibiting only this specific misconduct would be insufficient;

B. That the Court, pursuant to I.R.C. § 7407, enter a permanent injunction prohibiting Jason Stinson from acting as a federal tax return preparer;

45

C. That the Court find that Jason Stinson has engaged in conduct subject to penalty under I.R.C. § 6701, and that injunctive relief under I.R.C. § 7408 is appropriate to prevent a recurrence of that conduct;

D. That the Court find that Jason Stinson has engaged in conduct that interferes with the enforcement of the internal revenue laws, and that injunctive relief is appropriate to prevent the recurrence of that conduct pursuant to the Court's inherent equity powers and I.R.C. § 7402(a);

E. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter a permanent injunction prohibiting Jason Stinson, and all those in active concert or participation with him, from:

 (1) acting as a federal tax return preparer or requesting, assisting in, or directing the preparation or filing of federal tax returns, amended returns, or other related documents or forms for any person or entity other than himself;

 (2) preparing or assisting in preparing federal tax returns that he knows or reasonably should have known would result in an understatement of tax liability or the overstatement of federal tax refund(s) as penalized by I.R.C. § 6694;

 (3) owning, operating, managing, working in, controlling, licensing, consulting with, or franchising a tax return preparation business;

 (4) training, instructing, teaching, and creating or providing cheat sheets, memoranda, directions, instructions, or manuals, pertaining to the preparation of federal tax returns;

 (5) engaging in any other activity subject to penalty under I.R.C. §§ 6694, 6695, 6701, or any other penalty provision in the I.R.C.; and

 (6) engaging in any conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

F. That the Court, pursuant to I.R.C. §§ 7402(a) and 7407, enter an order requiring Jason Stinson to immediately and permanently close, because of the pervasive fraud, all tax return

46

preparation stores that he owns directly or through National Tax Services, LLC, or any other

entity, and whether those stores do business as LBS Tax Services or under any other name;

G. That the Court, pursuant to I.R.C. §§ 7402(a) and 7407, enter an order appointing a

receiver to sell all of the hard assets, such as computers (after any and all taxpayer information

has been removed), electronics, and furniture, for all tax return preparation stores that Jason

Stinson owns directly or through National Tax Services, LLC, or any other entity, and whether

those stores do business as LBS Tax Services or under any other name;

H. That the Court, pursuant to I.R.C. § 7402(a), enter an order prohibiting Jason Stinson,

directly or through National Tax Services, LLC, or any other entity, from assigning, transferring,

or selling any franchise agreement, independent contractor agreement, or employment contract

related to LBS Tax Services or any other tax return preparation business to which he or any

entity under his control is a party;

I. That the Court, pursuant to I.R.C. § 7402(a), enter an order barring Jason Stinson from:

(1) selling to _any_ individual or entity a list of customers, or any other customer information, for

whom Jason Stinson, LBS Tax Services, and any other business or name through which Stinson

or those acting at his direction have at any time since 2010 prepared a tax return; (2) assigning,

disseminating, providing, or giving to any current or former franchisee, General Sales Manager,

District Sales Manager, manager, tax return preparer, employee, or independent contractor of

Stinson, LBS Tax Services, or any other business through which Stinson prepares tax returns or

owns or franchises a tax return preparation business, a list of customers or any other customer

information for customers for whom Jason Stinson, LBS Tax Services, and any other business or

name through which Stinson or those acting at his direction have at any time since 2010 prepared

a tax return; and (3) selling to _any_ individual or entity any proprietary information pertaining to

LBS Tax Services and any other business or name through which Stinson or those acting at his direction have at any time since 2010 prepared a tax return;

J. That the Court, pursuant to 26 U.S.C. § 7402, enter an order requiring Jason Stinson to disgorge to the United States the proceeds (the amount of which is to be determined by the Court) that Jason Stinson and Nation Tax Services, LLC, received (in the form of fees) for the preparation of tax returns that make or report false or fraudulent claims, deductions, credits, income, expenses, or other information that results in the understatement of taxes, prepared since 2011 at LBS Tax Services stores owned by Jason Stinson and/or Nation Tax Services, LLC;

K. That the Court, pursuant to I.R.C. §§ 7402(a) and 7407, enter an order requiring Jason Stinson to contact, within thirty days of the Court's order, by United States mail and, if an e-mail address is known, by e-mail, all persons for whom Jason Stinson and his managers and preparers prepared federal tax returns or claims for a refund for tax years 2010 through 2013 to inform them of the permanent injunction entered against him, including sending a copy of the order of permanent injunction but not enclosing any other documents or enclosures unless agreed to by counsel for the United States or approved by the Court;

L. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter an order requiring Jason Stinson to produce to counsel for the United States, within thirty days of the Court's order, a list that identifies by name, social security number, address, e-mail address, and telephone number and tax period(s) all persons for whom Jason Stinson and his managers and preparers prepared federal tax returns or claims for a refund for tax years beginning in 2010 and continuing through this litigation;

M. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter an order requiring Jason Stinson to produce to counsel for the United States, within thirty days of the

48

Court's order, a list that identifies by name, address, e-mail address, and telephone number all principals, officers, managers, franchisees, employees, and independent contractors of Stinson, LBS Tax Services, and National Tax Services, LLC, from 2010 to the present;

N. That the Court, pursuant to I.R.C. §§ 7402(a), 7407, and 7408, enter an injunction requiring Jason Stinson to provide a copy of the Court's order to all principals, officers, managers, franchisees, employees, and independent contractors of Stinson, LBS Tax Services, and National Tax Services, LLC, within fifteen days of the Court's order, and provide to counsel for the United States within 30 days a signed and dated acknowledgment of receipt of the Court's order for each person whom Jason Stinson provided a copy of the Court's order;

O. That the Court retain jurisdiction over Jason Stinson and over this action to enforce any permanent injunction entered against him;

P. That the United States be entitled to conduct discovery to monitor Jason Stinson compliance with the terms of any permanent injunction entered against him; and

Q. That the Court grant the United States such other and further relief, including costs, as is just and reasonable.

DATED: September 23, 2014

A. LEE BENTLEY III
Acting United States Attorney

TAMARA W. ASHFORD
Acting Assistant Attorney General

s/:
JOSE A. OLIVERA
DANIEL A. APPLEGATE
STEVEN C. WOODLIFF
JESSICA S. REIMELT
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 7238, Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 353-0703
Fax: (202) 514-6770
Jose.A.Olivera@usdoj.gov