# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                  **Case No:   6:14-cv-1534-Orl-22TBS**

**JASON P. STINSON,**

        **Defendant.**

---

## MEMORANDUM OPINION

Plaintiff the United States (the "Government") filed this action seeking injunctive relief and disgorgement from Defendant Jason P. Stinson ("Stinson") for alleged violations of the Internal Revenue Code. (Doc. No. 1). The Court held a preliminary injunction hearing in January 2016. The Court then entered a preliminary injunction against Stinson that enjoined him from preparing tax returns or otherwise operating his tax preparation business.[1] (Doc. 69). On October 17–21, 2016 and November 21, 2016, the Court held a six-day bench trial. Having reviewed the evidence presented at the preliminary injunction hearing and at trial, the Court makes the following findings of fact and conclusions of law. The Court will grant the requested injunctive relief and will order the equitable remedy of disgorgement in the amount outlined below.

## I.    FINDINGS OF FACT

### A.  Stinson's Tax Preparation Business

Stinson began his tax preparation career in 2010 as a manager for LBS Tax Services ("LBS"). (Doc. 10 ¶ 12). In order for Stinson to become the manager of an LBS store, Stinson paid the owner of the LBS franchise, Walner Gachette $5,000. (Doc. 197 at 155). Mr. Gachette covered

---

[1] Stinson filed an interlocutory appeal (Doc. 70), and an Eleventh Circuit panel affirmed the grant of preliminary injunction (Doc. 163).

the store's expenses while Stinson managed the store and received 25% of the profits. (*Id.*) In 2011, at some time before the 2012 tax filing season, Stinson became a franchise owner of one LBS store located in Tampa, Florida. (Doc. 32-2 at 1). In 2012, Stinson expanded his franchise to a total of twelve LBS stores. (*Id.*) Stinson owned the LBS stores by way of Jason Stinson LLC. (Doc. 55-4 at 13–15). Stinson was the sole owner of Jason Stinson, LLC. (Doc. 197 at 158). Stinson hired managers to run each store, primarily individuals who were former tax preparers for Stinson the year before. (*Id.* at 162–163). Like Stinson had done, Stinson's managers paid Stinson a fee to become a manager, and in return, Stinson paid the managers a salary that Stinson determined. (*Id.* at 168).

In 2013, Stinson decided he did not want to do business under the LBS name, so he downsized his operations to ten store locations and started doing business under the name Nation Tax Services ("Nation Tax"). (Doc. 32-3 at 3). Stinson remained in the same physical spaces as his former LBS stores, kept the same employees, and continued to use the same customer files. (Doc. 197 at 166). In 2015, Stinson owned two stores in Tampa, Florida; one store in St. Petersburg, Florida; one store in Birmingham, Alabama; two stores in Raleigh, North Carolina; one store in Greenville, North Carolina; one store in Augusta, Georgia; one store in Fairfield, Alabama; and one store in Albany, Georgia. (Doc. 32-2 at 6–7).

In 2012, Stinson personally prepared hundreds of tax returns. (Doc. 197 at 160–161). However, by 2013, Stinson stopped preparing tax returns and left the tax preparation to his employees. (*Id.* at 163). Despite ownership of more than ten tax preparation stores, Stinson maintains that he does not believe he had sufficient knowledge to prepare tax returns. (*Id.* at 164). In total, the Internal Revenue Service ("IRS") identified over 14,000 tax returns prepared by Stinson's stores. (Plaintiff's Exhibit 765 ("Pl.'s Ex.")).

At all relevant times, Stinson has been the sole owner of the LLC that owns his tax preparation stores, and Stinson determines how the LLC is operated. (Doc. 197 at 160). Even though Stinson changed his LLC name from Jason Stinson LLC to Nation Tax Services LLC, he has owned his tax preparation stores through the same LLC. (Doc. 197 at 159–160). Stinson is the only individual with signature authority on all of Nation Tax Services LLC's bank accounts. (*Id.* at 239). All tax preparation fees that were paid to Nation Tax (or LBS when Stinson operated under that name) were deposited into the LLC's bank accounts. (*Id.* at 238–239). Although the bank accounts have been in the LLC's name, Stinson utilizes the accounts for personal and business purposes. (*Id.* at 240). In addition to owning tax preparation stores, Stinson also owns rental real estate property. (*Id.* at 152).

According to Stinson, his tax preparation stores target "underprivileged, undereducated poor people" and earned income credit claims. (Doc. 57 at 17; Doc. 197 at 173). Stinson's customers are "unsophisticated," according to him, and the customers come to Stinson's stores because they need assistance with their tax returns. (Doc. 10 ¶ 70; Doc. 197 at 173:20–25). Additionally, Stinson's business emphasizes marketing and advertising. (Doc. 197 at 175–176). LBS called its advertising efforts "guerilla marketing,"—dropping yard signs, going to residences, and shopping centers to advertise. (*Id.* at 176). LBS advertised a specific refund per child and a tax refund that taxpayers would receive the same day. (Pl.'s Ex. 268). The practice at Stinson's tax preparation stores was to not charge a fee for each tax return upfront, but rather extract the fee from the taxpayer customers' refund amount. Therefore, a larger refund was better for the client and for Stinson. Stinson often charged in excess of $600 per return, sometimes as much as $999, oftentimes without informing the taxpayer of the fee amount.[2] The goal was to get the maximum

---

[2] (Doc. 211-12 at 76–77 (discussing "$999 week" where Stinson would charge $999 for preparing tax returns that week); Doc. 195 at 53, 125, 293; Doc. 196 at 98; Doc. 197 at 16–17; Doc. 55-9 at 40–41; Doc. 198 at 63; Doc. 211-34 at 48).

refund to make the customer happy and deduct a larger fee. (Doc. 201 at 181–182, 194–195; Doc. 55-9 at 53, 66).

## B.   Testimony of Stinson's Taxpayer Customers: Tax Returns That Are False and Fraudulently Prepared

The Government claims that Stinson, by way of LBS and Nation Tax, has repeatedly engaged in the following fraudulent practices: (1) falsifying deductions on Form 1040 Schedule A to reduce a customer's taxable income by reporting personal expenses as business expenses and falsifying unreimbursed employee expenses and charitable contributions; (2) falsifying Form 1040 Schedule C deductions by fabricating businesses and reporting profits or losses from a false business or inflating profits[3] and losses from an actual business; (3) claiming false education credits; (4) falsifying a customer's earned income tax credit; (5) failing to conduct proper due diligence; and (6) failing to disclose fees and provide customers complete copies of their tax returns. (Doc. 218 at 27). To support its claims at trial, the Government presented more than fifteen taxpayer witnesses who testified that various amounts and claims on their tax returns were false, and that they had not provided the information that the tax return preparer put on the return. Additionally, the Government submitted by deposition the testimony of forty-one witnesses and their corresponding tax returns, primarily taxpayer customers, who also testified that they had not provided the false amounts on their tax returns. (Doc. 211). Many of Stinson's customers have been audited. Additionally, pursuant to Rule 65 of the Federal Rules of Civil Procedure, evidence that was received with the motion for preliminary injunction, that is otherwise admissible, became part of the evidence at trial. (Doc. 195 at 35).

Stinson targeted underprivileged individuals and earned income credit claims (Doc. 57 at 17; Doc. 197 at 173). The Earned Income Tax Credit ("EITC") "was enacted to provide relief for

---

[3] As is described *infra*, the goal was to reach an income falling in a "magic range" that maximized the taxpayer's refund.

low-income families hurt by rising food and energy prices." *United States v. Baxter*, 372 F. Supp. 2d 1326, 1328 (M.D. Ala. 2005) (citing *Sorenson v. Sec. of Treasury of U.S.*, 475 U.S. 851, 864, 106 S. Ct. 1600, 1609, 89 L. Ed. 2d 855 (1986)). The EITC is a refundable tax credit available to low-income workers and depends upon a multitude of factors, such as income, filing status, and number of dependents. (Doc. 69 at 2, n.2). For example, in tax year 2012, customers with earned income between $13,050 and $17,100 were eligible for the maximum EITC. Stinson would falsify information to claim the maximum EITC in a number of ways, or in a combination of these ways: claiming bogus dependents,[4] fabricating unreimbursed employee business expenses and charitable contributions, and fabricating business income or expenses.

### 1.   False Deductions on Form Schedule A

A Form Schedule A (Form 1040) ("Schedule A") is used for itemizing various deductions. (Doc. 198 at 2). Common deductions include home mortgage interest, property taxes, charitable contributions, and unreimbursed employee business expenses. (Doc. 198 at 62). Unreimbursed employee business expenses "are expenses that aren't covered by your employer that are required as part of your job." (*Id.*) Many of Stinson's customers' tax returns reported large employee business expenses with jobs that do not typically have such expenses. (*Id.*) For example, a bus driver would not have significant unreimbursed mileage expenses because a bus driver rarely, if ever, drives a private car. (*Id.*) Many tax returns prepared by Stinson or his employees claimed deductions for business mileage that were actually (and obviously) non-deductible commuting miles.[5] Oftentimes, the amounts claimed on the tax returns included tens of thousands of miles

---

[4] (Doc. 195 at 55; Doc. 200 at 21; Doc. 197 at 54; Doc. 211-19 at 35-37; Doc. 211-11 at 14-17, 22-23; Doc. 211-20 at 33 & Pl.'s Ex. 96).

[5] (Doc. 195 at 45–50, 58–60, 91–95 & Pl.'s Exs. 204 & 205 (improperly claiming business miles and vehicle expenses for both husband and wife); Doc. 195 at 241, 243–244 & Pl.'s Ex. 424 (same); Doc. 195 at 289–291, 297, 307, & Pl.'s Exs. 417, 418, & 419 (three years of claiming improper unreimbursed expenses and vehicle expenses); Doc. 200 at 8–10, & Pl.'s Ex. 522; Doc. 196 at 87–88 & Pl.'s Ex. 400 (preparer told him commuter miles could be deducted & the tax return listed as mileage almost 3 times what he would have told the preparer); Doc. 196 at 208–210 & Pl.'s Ex. 366; Doc. 196 at 231 & Pl.'s Ex. 249; Doc. 197 at 63–64; Doc. 211-3 at 30–32, 45–46 &

more than the customers actually drove for work.[6] Even after a hired consultant, Hermen Cruz ("Mr. Cruz"), *see infra*, instructed Stinson's employees that taxpayers could not claim commuter miles as business mileage, Stinson's preparers continued to do so.[7]

Additionally, many of the tax returns prepared by Stinson or his employees contained business expenses for meals, entertainment, and uniforms—expenses and amounts that the taxpayers testified were false and that they had not provided to the tax return preparer.[8] Other tax returns claimed personal cell phone expenses as unreimbursed business expenses even though these were clearly not a business expense.[9] In many instances, the individuals' unreimbursed business expenses made up a large portion, sometimes more than half, of the income they had earned that year.[10] For example, it is illogical for an individual making around $35,000 a year to spend as much as half of their yearly income, around $16,000, on unreimbursed business expenses. (Doc. 55-34 at 22–23 & Doc. 55-36). One of the tax returns claimed employee business expenses of $6,000 more than the taxpayer's income for that year. (Doc. 211-36 at 32 & Pl.'s Ex. 26). Many of the tax returns contained false charitable contributions in amounts that the taxpayers testified were not accurate, and that they had not, and would not have, provided to the tax return preparer.[11]

---

Pl.'s Exs. 67 & 70; Doc. 211-41 at 24–25 & Pl.'s Ex. 17).

[6] (*Id.*)

[7] (Doc. 197 at 19–21 & Pl.'s Ex. 189; Doc. 55-11 at 13–15 & Doc. 55-12; Doc. 55-17 at 17–22 & Doc. 55-18; Doc. 55-30 at 20–21 & Doc. 55-31; Doc. 55-32 at 18–22 & Doc. 55-33; Doc. 55-34 at 15–18 & Doc. 55-35; Doc. 55-8 at 134).

[8] (Doc. 195 at 50, 59 & Pl.'s Exs. 204 & 205 (reporting over $2,000 for meals and entertainment for work when taxpayer testified she had no such expenses); Doc. 196 at 205–206 & Pl.'s Ex. 249 (false expenses for cell phone and uniforms); Doc. 211-23 at 19 & Pl.'s Ex. 21 at 9; Doc. 211-41 at 25–26 & Pl.'s Ex. 17)).

[9] (Doc. 211-13 at 20 & Pl.'s Ex. 22; Doc. 211-41 at 29–30, 39 & Pl.'s Exs. 17 & 19; Doc. 197 at 178–179, 285–286; Doc. 196 at 205–206 & Pl.'s Ex. 249).

[10] (Doc. 195 at 305–307 & Pl.'s Ex. 419 (reporting employee business expenses in an amount 64% of total wages that year); Pl.'s Ex. 366 (reporting employee business expenses of over $41,000 when total income that year was only $57,358); Doc. 211-41 at 38–39 & Pl.'s Ex. 19 (reporting unreimbursed employee business expenses as $34,493.00 when taxpayer's total income was $41,000.00); Doc. 55-32 at 29 & Doc. 55-33 (reporting employee expenses as 65% of income); Doc. 55-34 at 22–23 & Doc. 55-36 (reporting $15,923 in employee business expenses when taxpayer made a total of $34,666 in income that year); Doc. 200 at 17; Doc. 197 at 62 & Pl.'s Ex. 376).

[11] (Doc. 200 at 17 & Pl.'s Ex. 519; Doc. 195 at 305; Doc. 211-36 at 16, 26 & Pl.'s Ex. 25; Doc. 195 at 169–172 (taxpayer testified she gave minimal amounts to her church but tax return stated that she gave over $5,000 to charity); Doc. 195 at 305, 311–312 & Pl.'s Exs. 419, 420 (two separate years where tax return stated charitable contributions that taxpayer denies and denies providing that information to preparer); Doc. 196 at 79–81, 93 & Pl.'s Exs. 400, 401 (multiple years reporting charitable contributions that taxpayer denies providing and testifies are

On another tax return, Stinson's employee wrongfully listed taxpayers as having dependents.[12] On another return, the reported mortgage interest paid that year exceeded the mortgage statement.[13]

A number of the tax returns prepared by Stinson or his preparers falsely claimed what is called household help income ("HSH").[14] HSH is "a very unusual income because it's reserved for people who work in someone's home: domestic workers, people who work as maids or nannies." (Doc. 198 at 59). In tax returns prepared at Stinson's stores, HSH "was used quite a few times with types of employment you would not expect to see generate the household income. For example, a hair dresser. A hair dresser would not be [HSH]." (*Id*.) Notably, it is rather uncommon to have HSH income. *United States v. Barber*, 591 F. App'x 809, 813 (11th Cir. 2014)[15].

Unreimbursed employee business expenses are generally reported in specific line-item detail on an IRS Form 2106, and the total amount of employee business expenses is reported on the "unreimbursed employee expenses" line on the Schedule A. (Doc. 218 at ¶ 108). Many 2014 tax returns prepared in 2015, after Mr. Cruz provided training, claimed unreimbursed employee business expenses on Schedule A but did not have a supporting Form 2106 explaining the basis of the claim.[16]

## 2. Educational Credits

Another area replete with falsified amounts was education credits.[17] On some tax returns, qualified education expenses were claimed on the tax return, yet the taxpayer testified that he or

---

false); Doc. 197 at 61 & Pl.'s Ex. 367; Doc. 200 at 16–17 & Pl.'s Ex. 519 ("I know I never claimed any charity on my income tax, never." Yet, tax return claims $1,500 in donations to charity).

[12] (Doc. 211-14 at 14–15; Doc. 200 at 51).

[13] (Doc. 211-23 at 16–18 & Pl.'s Ex. 22).

[14] (Doc. 211-32 at 30–31 & Pl.'s Ex. 134; Doc. 211-28 at 31 & Pl.'s Ex. 11; Doc. 211-30 at 23 & Pl.'s Ex. 129).

[15] In the Eleventh Circuit, unpublished decisions may be cited as persuasive, but not binding, authority.

[16] (Doc. 55-8 at 134–135; Doc. 211-3 at 19–21; Doc. 201 at 268–269, 272; Doc. 90; Doc. 103; Doc. 55-12).

[17] A taxpayer may claim the American Opportunity Credit for qualified education expenses incurred by the taxpayer, the taxpayer's spouse, or the taxpayer's dependents, including college or postsecondary tuition. *United States v. Lawrence*, No. 15-62233-CIV, 2016 WL 5390569, at *3 (S.D. Fla. Sept. 27, 2016)

she did not attend school that year and did not tell the tax preparer otherwise.[18] On other tax returns, the taxpayer had attended school but the amount of qualified education expenses claimed were greater than the taxpayers' out-of-pocket expenses.[19] Other times, the amount of qualified education expenses claimed on a tax return did not match the official documents that taxpayer customers had provided the preparer.[20] (Doc. 197 at 259, 268–269). Stinson received these documents because he kept them in his customer files. (*Id*.)

### 3. Fabricated Business Income and Expenses on Form Schedule C

A Form Schedule C (Form 1040) ("Schedule C") itemizes various business expenses and is used to list income and expenses related to self-employment, primarily the business losses and gains of a sole proprietor.[21] (Doc. 198 at 60). Reporting income from a business on a Schedule C is one way to increase total income on a tax return. (*Id*. at 61). A number of the tax returns admitted into evidence listed a "fake business" on a Schedule C form. In other words, the tax return reported losses and profits from a business that the taxpayer testified he or she did not have. (*See* Doc. 211-4 at 15–16; Pl.'s Ex. 61) (reporting a "private care" business that the taxpayer did not have and did not report that she had). In addition to tax returns that reported fake businesses, other returns overstated business profits. (Doc. 211-10 at 25–31; Pl.'s Ex. 136) (reporting incorrect profit from cleaning business).

---

[18] (Doc. 195 at 46–47 & 51 Pl.'s Ex. 204; Doc. 195 at 291–292 & Pl.'s Ex. 417 (taxpayer testified he did not go to school that year, and did not tell the preparer that he did, but tax return claims $1,000 in education expenses); Doc. 196 at 205 & Pl.'s Ex. 249; Doc. 196 at 130, 134–135 & Pl.'s Ex. 399 (claiming qualified education expenses of almost $2,000 for taxpayer who did not graduate high school); Doc. 55-11 at 47–49 & Pl.'s Ex. 115; Doc. 195 at 236–238 & Pl.'s Ex. 424 (did not attend school but tax return lists qualified education expenses); Doc. 197 at 54–55 & Pl.'s Ex. 371; Doc. 196 at 204–205 & Pl.'s Ex. 249 at 17).

[19] (Doc. 196 at 40–43 & Pl.'s Ex. 347; Pl.'s Ex. 784 (scholarship award exceeds education expenses)).

[20] (Doc. 211-18 at 30–33 & Pl.'s Ex. 2 (qualified education amount on 1098T does not match tax return)).

[21] If there is an employee-employer relationship and the employee has unreimbursed expenses arising out of the employment, those expenses are to be reported under a Schedule A. *See Butts v. C.I.R.*, 49 F.3d 713, 714 (11th Cir. 1995). In contrast, if a sole proprietor, self-employed individual, or a general contractor has expenses or business losses, those expenses are to be reported under a Schedule C. *Id.*

For example, Georgia Gordon's 2011 and 2012 tax returns reported that she had a business in "home health services," but Ms. Gordon testified that she did not have a business. (Doc. 195 at 117–118, 122–123; Pl.'s Exs. 379 & 380). Alberto Bermudez's tax return reported that he had a personal security business; however, Mr. Bermudez testified that, while he was employed as a security guard, he did not have a security business and did not know it was on his tax return. (Doc. 195 at 285–287; Pl.'s Ex. 417). One of Stinson's preparers reported that a taxpayer, Latrecia Burkes, had a hair business; however, Ms. Burkes testified that she never told the preparer that she had a hair business, did not know this was on her tax return, and would not have permitted it on her return had she known. (Doc. 196 at 138–139, 143–146; Pl.'s Exs. 398 & 399). In contrast, Ms. Burkes testified that the tax preparer asked her who does her daughter's hair, but that was the extent of their conversation. (*Id*.)

Stinson's name appeared on a tax return that falsely reported that Tywana Williamson had a home cleaning service business with a profit of $5,000. (Doc. 197 at 55–57; Pl.'s Ex. 371). Ms. Williamson testified that both the business and the profit reported were false, and that she would not have told the preparer to report a business she did not have. (*Id*.) Additionally, Stinson's tax preparer reported a cleaning service business on Arquetta Montgomery's tax return. (Doc. 211-27 at 15; Pl.'s Ex. 44). Ms. Montgomery, however, testified that she did not have a cleaning services business and never did, and that the tax preparer did not ask her if she had one. (*Id*.) In other instances, the taxpayer had a business, but the profit reported was incorrect. (Doc. 196 at 175) ("I didn't give them that 6,291. So I mean, it went into my income, I guess, as far as for the business to generate a larger tax return.").

Additionally, Stinson and his preparers would combine improper Schedule C losses with false deductions listed on a customer's Schedule A in order to fraudulently lower a customer's taxable income. (Doc. 218 at 72, ¶ 262). For example, on David Hunter's 2013 tax return, one of

Stinson's tax preparers reported a non-existent business with more than $12,000 in false losses on the Schedule C and also reported more than $30,000 in false deductions on Schedule A. (Doc. 211-16 at 17 & Pl.'s Ex. 64) (tax return falsely stated that taxpayer had a moving business). Similarly, on Ms. Montgomery's 2013 tax return, a Stinson preparer claimed a false business loss of $9,050 on the Schedule C, while also claiming false unreimbursed employee business expenses of $17,873 and improper charitable contributions in the amount of $2,679. (Doc. 211-27 at 15, 24, 25 & Pl's Ex. 45).

### 4. Due Diligence Violations

A tax return preparer must make reasonable inquiries to ensure the customer is legitimately entitled to the EITC, document compliance with the due diligence requirements, and keep that documentation for three years. 26 C.F.R. § 1.6995-2. This includes completing the "Paid Preparer's Earned Income Credit Checklist" ("Form 8867"). (Doc. 218 at 31). The Government presented evidence of a number of due diligence violations.

Stinson's preparers would check boxes on Form 8867 without actually receiving documentation from customers. (*See e.g.*, Doc. 211-10 at 33 (no medical records) & Ex. 136 (checking box for medical records); Doc. 55-11 at 41; Doc. 55-14 at 11). For example, Stinson's preparers checked on the Form 8867 that the taxpayers provided medical and school records for their children when they had not.[22] For tax returns claiming Schedule C business profits or losses, Stinson or one of his preparers would check that the taxpayer had provided "receipts or receipt books" on the due diligence Form 8867 when such information had not been provided.[23]

---

[22] (Doc. 196 at 96 & Pl.'s Ex. 401; Doc. 197 at 65–66 & Pl.'s Ex. 367; Doc. 211-10 at 33 & Pl.'s Ex. 136 at 9; Doc. 55-11 at 41 & Doc. 55-14; Doc. 211-38 at 25 & Pl.'s Ex. 127; Doc. 196 at 174 & Pl.'s Ex. 385; Doc. 211-18 at 29–30 & Pl.'s Ex. 1 at 11: Doc. 211-30 at 38 & Pl.'s Ex. 130; Doc. 211-14 at 24; Doc. 211-5 at 30–31 & Pl.'s Ex. 137).

[23] (Doc. 195 at 121 & Pl.'s Ex. 381; Doc. 196 at 173 & Pl.'s Ex. 385; Doc. 196 at 137 & Pl.'s Ex. 399 (see page 23 of the tax return); Doc. 197 at 58 & Pl.'s Ex. 369).

Despite the fact that taxpayers are supposed to receive a complete copy of their tax returns pursuant to 26 U.S.C. §§ 6107 and 6695(a), a number of taxpayer witnesses testified that they did not receive a copy of their tax returns.[24] In other instances, the taxpayer received a copy of their tax return but it was missing pages or forms.[25] One taxpayer had received documents with completely different amounts than were on his actual tax return. (Doc. 211-24 at 37–39). Alarmingly, some taxpayers testified that they signed blank forms or that they were not shown the page with the amounts written on it. (Doc. 211-30 at 43–46; Doc. 211-39 at 48–49). Stinson's managers denied that they had provided blank forms. (Doc. 208 at 43–44).

At trial, Stinson called several of his store managers as witnesses. While some of Stinson's employee witnesses admitted that tax returns were incorrect or did not contain supporting documentation, they denied fault and blamed the taxpayers for providing false information. (Doc. 201 at 262–267, 271–272; Doc. 208 at 103, 112). Stinson did not call a taxpayer witness of his own or present a single accurate tax return prepared by his stores. According to Stinson, the taxpayers are not credible or reliable because their tax returns were prepared years ago, and the taxpayers would not admit to their wrongdoing.[26] (Doc. 219 at 63–66, 85, 112). Stinson made a similar argument in opposing the preliminary injunction that the Court rejected because there was "no persuasive reason to discount the sworn testimony of over twenty customers . . . , [and] the same argument could be made about the reliability of the testimony of Stinson's tax return preparers." (Doc. 69 at 5).

The Court finds that the taxpayers' testimony is credible. First, many of the audits submitted into evidence stated that the Tax Compliance Officer ("TCO") did not recommend a

---

[24] (Doc. 196 at 75–76; Doc. 211-3 at 21–22; Doc. 211-14 at 38; Doc. 211-17 at 11–12; Doc. 211-18 at 25; Doc. 211-21 at 11–12; Doc. 211-23 at 23; Doc. 211-31 at 13; Doc. 211-33 at 44; Doc. 211-28 at 39).

[25] (Doc. 211-9 at 32 (taxpayer did not receive Form 2106 that contained the fabricated business expenses); Doc. 211-41 at 18, 41 (taxpayer did not receive the Schedule A itemized deductions)).

[26] Even if the taxpayers were negligent in not reviewing their return, this is not the issue before the Court in this lawsuit against Stinson. The Court does not believe it absolves Stinson of liability for acting as a tax preparer.

penalty against the taxpayer because the taxpayer did not show "intentional disregard" for the tax laws.[27] (Pl.'s Exs. 284, 355, 356, 368, 399). Though Stinson points to a number of audits that did not recommend preparer penalties, there were many audits that did recommend considering a penalty against the preparer.[28] Many of the taxpayers testified that they did not know anything about tax preparation and trusted Stinson's stores to prepare their tax returns properly.[29] Stinson's own witness testified that Stinson's stores targeted lower income areas where the taxpayers were not aware of what credits are available, yet Stinson argues that these same taxpayers were knowledgeable enough to know how to falsify amounts to increase their tax refund amount. (Doc. 208 at 138). Furthermore, Stinson has not presented evidence showing that the taxpayers knew the amounts were wrong, or that they knew they were submitting tax returns with improper claims. In contrast, the taxpayers testified that they were not aware the amounts were on their returns and did not review them. (*See e.g.*, Doc. 211-3 at 20, 67). Notably, some of Stinson's preparers made false claims while preparing their own individual tax returns. (Doc. 208 at 62–64 (claiming employee

---

[27] Stinson contests the admissibility of all of the audits admitted into evidence at trial. (Doc. 219 at 152–173). The Court has addressed the admissibility of audit files multiple times. First, the Magistrate Judge addressed the issue in the context of Stinson's motion to compel the deposition of the IRS investigator Ricky Poole or Stinson's alternative motion to strike Mr. Poole's declaration. (Doc. 117 at 7) (stating that "the Court fails to understand how it can be said that the audits were not made in the ordinary course of the IRS's business"). This decision was appealed to the undersigned Judge, and the decision was affirmed. (Doc. 143 at 16–18) (finding that the audit files were made in the ordinary course of business and that Stinson had not demonstrated that the audit files were not trustworthy). Stinson raised the issue again at trial, and the Court permitted briefing during trial. (Doc. 184 at 2). The Court overruled Stinson's objection because Stinson failed to cite a single case in support of his argument, and the Court did not find that Stinson had provided a persuasive reason to depart from its prior ruling. (Doc. 204 at 15–17). Despite this, Stinson dedicated over twenty-five pages of his post-trial brief to the admissibility of audit files. (Doc. 219 at 152–172, 206–211). Stinson did not file a motion for reconsideration of any prior order on the issue. More importantly, Stinson has not met the standard for reconsideration: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice." *McGuire v. Ryland Grp., Inc.*, 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007) (citation omitted). The moving party must meet a very high standard, presenting "facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *Id.* Notably, "[a] party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a motion for reconsideration." *Id.* Stinson had a full and fair opportunity to brief the issue, and Stinson has failed to convince the Court that reconsideration is appropriate.

[28] (*See e.g.*, Pl's Exs. 368, 399, 607, 609, 611, 613, 615, 616–618, 628) (not an exhaustive list)). Stinson argues that over fifty of the two-hundred audits found no preparer misconduct or did not recommend a penalty. However, the Court does not find that this precludes a finding of fraud. Stinson attached an exhibit to his post-trial brief that was not admitted into evidence at trial (one of eight "new" exhibits). The Court does not consider this exhibit, or any of the other exhibits, that Stinson attached to his trial brief that were not admitted at trial.

[29] (*See* Doc. 195 at 80, 158, 315; Doc. 196 at 88, 243; Doc. 197 at 41, 163; Doc. 200 at 13–14).

expenses in an amount that was more than half total income); Doc. 55-37 at 141–143; Pl.'s Ex. 192; Doc. 55-38). The Court finds that the taxpayer testimony is probative of fraud on the part of Stinson and his employees.

Due to the filing of improper claims on an immeasurable amount of tax returns, Stinson's tax preparation stores have caused harm to the United States Treasury and to the taxpayer victims. Notably, many of Stinson's customers have been audited by the IRS and, consequently, owe money on their modest incomes as a result.[30]

## C.  How Stinson's Tax Preparers Were Trained

At trial, Stinson did not admit culpability or show remorse for the harm he has caused his customers. Stinson took the position that, because he provided some training to remedy some of the issues with tax preparation, he should not be held liable. The Court finds it relevant to discuss the training provided by Mr. Gachette to employees of LBS, including Stinson's employees, and the training that Stinson provided to employees at Nation Tax after he changed the name of his stores. Notably, Stinson owned his tax preparation stores through the same LLC, it just changed names from LBS to Nation Tax. After the name change, Stinson operated stores at the same physical addresses and used the same customer files. Stinson has not shown a material difference in their operations aside from the superficial name of the stores.

Stinson and many of his managers and preparers had no experience preparing tax returns prior to their involvement with LBS and Nation Tax. (Doc. 197 at 153; Doc. 211-6 at 9–10; Doc. 55-40 at 24). At LBS, training was focused on policies, managing employees, and marketing potential customers.[31] (Doc. 10 ¶ 27; Doc. 197 at 154). LBS employees were given scripts to

---

[30]  (Doc. 195 at 61–62 (owing $14,000 to the IRS), 99, 127, 132, 214–215, 260; Pl.'s Ex. 383; Pl.'s Ex. 249; Pl.'s Ex. 399; Doc. 196 at 99–100 (owing a little more than $15,000 to the IRS); Doc. 197 at 69; Doc. 211-41 at 42–43; Doc. 211-20 at 19). The following tax returns were audited by the IRS: Pl.'s Exs. 399, 429, 586–740.
[31]  Training was 70% marketing and 30% related to the software program. (Doc. 197 at 155).

memorize when interviewing customers. (*Id.*; Pl.'s Ex. 186). At LBS, employees, including Stinson, were trained to report commuting miles as business miles, to report money spent on food as deductible meal expenses, and to report cell phone bills as unreimbursed employee business expenses regardless of whether the phone was used for personal or business purposes—all of which are improper. (Doc. 55-2 at 64, 66–67; Doc. 197 at 178–79). From 2010 to 2013, while Stinson was operating under the LBS name, Stinson and his employees attended various trainings. (Doc. 32-2 at 1). This included an instruction sheet that shows pre-determined responses for questions on the tax return without regard to the individual taxpayer's response or supporting documentation. (Pl.'s Ex. 186). At one of LBS's trainings, Stinson met Marlene Guzman ("Ms. Guzman"), who also worked as an LBS tax preparer and manager from 2009–2013. (Doc. 211-12 at 8; Doc. 211-12 at 6–8, 12, 68, 69). While Ms. Guzman did not work at any of Stinson's stores, she knew Stinson, attended training with Stinson, and communicated with Stinson's managers. (*Id.* at 14, 15, 17, 18, 20, 21, 92, 136).

Ms. Guzman's deposition was admitted at trial. (Doc. 211-12). Ms. Guzman testified as to the training she received from LBS. Specifically, that LBS employees were trained to figure out how to decrease or increase a customer's taxable income to get the taxpayer "more income to get to the amount that you're needing." (*Id.* at 30). LBS called this "maximizing the refund" which meant to "basically let [the customer] know that we're going to look for more forms to get you more money." (Doc. 211-12 at 41). LBS also used the term "magic numbers" at one of LBS's trainings and in a document provided to the tax preparers. (Doc. 211-12 at 41). One of LBS's documents provides that "magic numbers" is an income range from $16,000 to $18,000, presumably, where the taxpayer would get the largest refund. (Pl.'s Ex. 456; Doc. 211-12 at 43). The document states that "anything lower than this you try to add income," and instructs that if anything higher, "to try to take away income." (Pl.'s Ex. 456). At the first year of training, LBS

employees were instructed to "[j]ust add income." (Doc. 211-12 at 44) (Q: "Just make up a number?" A: "That's it."). By the second year, employees were told to "lure [the customer] in to basically state that they make extra income." (*Id.*)

Additionally, LBS employees were trained to ask questions to take away income to hit the "magic range" or get the "perfect number" to make the customer happy. (Doc. 211-12 at 49, 53; Doc. 55-9 at 36; Doc. 211-34 at 81–82). If a customer's income was lower than $10,000, the goal was to increase their income so they could get more money by adding additional forms, such as a Schedule C. (*Id.*) The document provided at training even states "input an income of 10000 on sch c," and LBS employees were trained to input a specific Schedule C income depending on the number of children the taxpayer had. (Pl.'s Ex. 456; Doc. 211-12 at 51). LBS employees also determined what to put on the customer's tax return for business mileage. (Doc. 211-12 at 55; Doc. 55-9 at 117 ("I was taught to play with those business mileage numbers to get to a number that would help increase his refund.")). Ms. Guzman did not know at the time that she was being instructed to provide a false number on the return, but looking back with her present knowledge of the tax laws, she believes that LBS trained her to prepare tax returns in a manner that resulted in false information inputted on those returns. (*Id.* at 163).

Stinson asserts that he spent a lot of money on training his employees. (Doc. 197 at 171). This training did not occur until after Stinson was notified that he was under IRS investigation, and he had met with IRS Agent Ricky Poole. (*Id.* at 206–208). At that time Stinson contacted Latino Tax to provide a two-day training session for his managers, although Stinson did not attend the entire training nor did he complete any tutorials because, according to him, "I didn't do taxes. I didn't need to." (*Id.* at 298, 210, 212:21–22; Pl.'s Ex. 210A). Not until the summer of 2014, after this lawsuit was filed, did Stinson hire Mr. Cruz to provide additional training. (*Id.* at 213). Mr. Cruz works at H & R Block and is knowledgeable with regard to tax preparation—he has been

preparing taxes for over twenty-five years. (*Id.* at 213–214). Stinson's managers, but not Stinson or the tax return preparers, attended Mr. Cruz's training. (*Id.* at 220). Mr. Cruz developed a training program based on his review of tax returns prepared at Stinson's stores. (Doc. 208 at 151–152, 165). Notably, Mr. Cruz did not provide training related to business expenses, Schedule A, Schedule C, or the EITC—the areas where Stinson's customers' tax returns display a pattern of false claims. (*Id.* at 154–155). Mr. Cruz believed that Stinson's employees' knowledge of preparing tax returns was poor, and they did not understand what qualifies as a business mile for purposes of reporting a business mile deduction. (*Id.* at 47; Doc. 55-8 at 47). Mr. Cruz did not provide oversight review of any tax returns prepared by Stinson's employees. (Doc. 197 at 225). Mr. Cruz did inform Stinson's managers that they cannot claim commuter miles as unreimbursed employment expenses (Doc. 55-8 at 51:3–53:10); however, the Government admitted into evidence tax returns prepared after this training still claiming improper business mileage.[32] Mr. Cruz has not been completely reimbursed for his services. (Doc. 208 at 155).

In December 2014, Stinson had a CPA, Howard McKnight, speak with his managers about not taking every customer that comes in the door. (Doc. 201 at 211). Mr. McKnight made clear that he had not provided any substantive training or reviewed any tax returns. (*Id.* at 212, 217, 225–226). Stinson also asked his managers to attend an IRS tax forum that covers changes in the tax laws from year-to-year. (Doc. 208 at 218). At least by 2013, Stinson required his employees to sign a "due diligence handbook." (Doc. 208 at 91–91; Defendant's Exhibit 24A ("Def.'s Ex.")). Lastly, Drake Software, the tax preparation software that Stinson used at LBS, provided training on the use of their software but did not otherwise provide substantive training. (Doc. 197 at 107, 110–112).

---

[32] (Doc. 197 at 19–21 & Pl.'s Ex. 189; Doc. 211-38 at 13, 22; Doc. 55-11 at 13–15 & Doc. 55-12; Doc. 55-17 at 17–22 & Doc. 55-18; Doc. 55-30 at 20–21 & Doc. 55-31; Doc. 55-32 at 18–22 & Doc. 55-33; Doc. 55-34 at 15–18 & Doc. 55-35; Doc. 55-8 at 134).

Although Stinson provided some unstructured training to his managers, which occurred after the IRS investigation commenced, the Court does not find that this training is sufficient to prevent recurrence of Stinson's conduct. First, a number of improper practices continued after the training.[33] Second, the training did not cover the areas, discussed above, where there is a pattern of improper claims—Schedule As, Schedule Cs, the EITC, and due diligence. Third, only a small subset of Stinson's employees actually received the training—the managers. Fourth, Stinson has not shown remorse or accepted responsibility for the improper preparation of his customers' tax returns. At trial, Stinson maintained that he does not need to know how to prepare tax returns despite ownership of a tax preparation business.

### D. IRS Investigation of Stinson

The IRS began investigating Stinson in March 2013. (Doc. 200 at 112). The IRS employee assigned to investigate Stinson was Mr. Poole. (*Id*. at 104). Mr. Poole has twenty-six years of experience working for the IRS and currently investigates tax return preparers and promoters of tax schemes. (*Id*.) Mr. Poole's investigations consist of interviewing the target of the investigation and reviewing relevant documents. (*Id*. at 108–113). Mr. Poole's investigative duties also include determining whether or not to assess civil penalties or to refer the case to IRS counsel to determine whether to send a request to the Department of Justice to file a lawsuit. (*Id*. at 111–112). At the

---

[33] (Doc. 211-18 & Pl.'s Ex. 6 (claiming improper education credit); Doc. 197 at 22 & Pl.'s Ex. 189 (claiming improper status of single); Doc. 211-3 at 24 – 25 & Pl.'s Ex. 65 (improper due diligence checklist); Doc. 211-28 & Pl's Ex. 13 (did not give copy of tax return to taxpayer); Doc. 211-9 at 40–45 & Pl.'s Ex. 40 (tax return that claims improper Schedule C business expenses and incorrect business mileage); Doc. 211-11 at 22, 34–37 & Pl.'s Exs. 35 & 36 (tax return claims improper filing status & claiming commuter miles as business miles); Doc. 211-14 at 24 & Pl.'s Exs. 29, 30 (improper due diligence checklist); Doc. 197 at 19–21 & Pl.'s Ex. 189; Doc. 211-38 at 13, 22; Doc. 211-25 at 15–19 & Pl.'s Ex. 54 (tax return claims improper charitable donation and unreimbursed employee expenses); Doc. 211-4 at 15 & Pl.'s Ex. 61 (tax return listing a fake business); Doc. 211-26 at 41–42 & Pl.'s Ex. 53 (reporting false profits from a business); Doc. 55-11 at 13–15 & Doc. 55-12; Doc. 55-17 at 17–22 & Doc. 55-18; Doc. 55-30 at 20–21 & Doc. 55-31; Doc. 55-32 at 18–22 & Doc. 55-33; Doc. 55-34 at 15–18 & Doc. 55-35; Doc. 55-8 at 134); Doc. 55-34 & Doc. 55-36; Doc. 211-33 at 46–49 & Pl.'s Ex. 43). The following are 2014 tax returns admitted as exhibits at trial, that were prepared in 2015, after this lawsuit had commenced and required adjustments: Pl.'s Exs 5, 6, 9, 13, 15, 29, 30, 35, 36, 40, 43, 47, 49, 53, 53, 58, 61, 65, 66, 90, 94, 102, 103 117, 122, 123, 126, 132, 133, 136, 155, 156, 158, 163, 165, 189, 260, 291.

end of each investigation, it is Mr. Poole's job to determine whether penalties will be assessed.[34]

(*Id*. at 112, 124–125).

In the course of his investigation, Mr. Poole interviewed Stinson and two of his store managers.[35] (*Id*. at 114–117). Mr. Poole selected a sample of twenty tax returns from tax year 2012, prepared in 2013, that contained a Schedule A and a Schedule C.[36] (*Id*. at 120–121). An IRS list keeper selected additional tax returns and sent the matters out to TCOs to conduct audits. (*Id*. at 122–123). Thereafter, Mr. Poole compiled a summary spreadsheet of the audits performed on tax returns prepared by Stinson and his stores, a total of two-hundred audits (154 of them from tax year 2012),[37] and Mr. Poole included in the spreadsheet the total tax deficiencies. (Doc. 201 at 32, 152; Pl.'s Ex. 773). According to those audits, adjustments were made in the following areas: Schedule A unreimbursed employee business expenses, Schedule A charitable contributions, Schedule C business income or expenses, and the EITC. (Doc. 200 at 151–152). Mr. Poole also reviewed additional audits of tax returns prepared in 2010 and 2011 by Stinson's tax preparation stores.[38] These audits were not commissioned by Mr. Poole, but were tax returns randomly audited

---

[34] Mr. Poole testified that penalties had not been assessed in this case, but that he usually waits until the end to make an ultimate decision regarding penalties. (Doc. 200 at 125). Right now, this case has not concluded, and the current status is that it is in litigation. (*Id*.) Mr. Poole testified that he will be assessing penalties at the end. (*Id*. at 126).

[35] In Stinson's post-trial brief, he argues that Mr. Poole's testimony is not admissible, that he cannot render opinions, and that he cannot testify regarding the audit files. (Doc. 219 at 141–146, 152–163). Stinson has made this argument multiple times. The Court addressed Stinson's objection to Poole's declaration and testimony regarding IRS audit files in its Order denying Stinson's motion for summary judgment. (Doc. 143 at 14–18). Thereafter, Stinson objected to Mr. Poole's testimony at trial, and the Court requested briefing on the admissibility of Mr. Poole's testimony (Doc. 184 at 2 ¶ 4). The Court overruled Stinson's objection to Poole's testimony because Stinson did not cite case law, and the Court found that Mr. Poole's testimony was permissible under Federal Rule of Civil Procedure 803(6). (Doc. 204 at 15–17). Despite that the Court requested briefing on this matter during trial, and has already ruled on it, Stinson reargues the matter in his post-trial brief. Notably, Stinson did not file a motion for reconsideration, and the Court finds that he does not meet the standard for the Court to reconsider the matter. *See Carroll v. TheStreet.com, Inc*., No. 11-cv-81173, 2014 WL 5474048, at *5 (S.D. Fla. Apr. 10, 2014) ("a motion for reconsideration is not a vehicle for relitigating old issues").

[36] Stinson's stores prepared the following tax returns: (1) in 2013, 4,631 returns of which 4,599 claimed a refund, (2) in 2014, 5,089 returns of which 5,037 claimed a refund, (3) in 2015, 4,564 returns of which 4,498 claimed a refund. (Doc. 200 at 119–120, Pl.'s Ex. 765). On average, 98-99% of the taxpayers claimed a refund. (*Id*.)

[37] The TCOs were auditing the year 2012, however, they look at other years, in addition to 2012, for similar issues with the tax returns occurring in other years. (Doc. 200 at 123).

[38] Stinson contends that in ninety of these audit files, the taxpayer did not sign agreeing to the IRS auditor's estimated tax deficiency. (Doc. 219 at 61, n.188) (citing Government's exhibit numbers). Mr. Poole testified that

by the IRS. (*Id.* at 134). Mr. Poole found that 95% of these tax returns required an adjustment. (*Id.* at 134). Stinson also identified seventeen audit files—audits also not commissioned by Mr. Poole—that did not include a finding of fraud or recommend tax preparer penalties, but many of these audits still required an adjustment.[39] (Doc. 219 at 62). Mr. Poole testified that he saw the "same pattern of abuse" among the tax returns he reviewed. (*Id.* at 128).

For tax years 2012–2014, Nation Tax filed 1,965 tax returns containing a Form Schedule A. (Doc. 200 at 170). Of these tax returns, 1,861 reported (the unusual claim for) unreimbursed employee business expenses. (*Id.*) The average wages reported was $35,040, and the average amount of unreimbursed employee business income was $15,450—that is, the average percentage of customers' wages reported as an unreimbursed business expense was 44% of their income. (*Id.*) Additionally, Mr. Poole summarized tax returns filed by Nation Tax in 2012–2014 containing a Schedule C. (*Id.* at 171–174). During this period, Nation Tax Services filed 5,501 tax returns with a Schedule C attached, and only 137 of these returns claimed a loss, (*Id.* at 171–173), while 5,364 claimed a profit, (*Id.*; Pl.'s Ex. 769).

In February 2016, IRS Agent Holly Shields ("Ms. Shields"), an IRS employee assigned to a group that investigates potentially abusive tax practices, coordinated interviews of a randomly selected sample of Nation Tax customers located in St. Petersburg, Florida and Tampa, Florida for the 2013 tax year.[40] (Doc. 198 at 36–39). Ms. Shields oversaw four IRS revenue agents, including

---

these audit files were randomly-picked audits that were sent to him, but that he had not been involved in these audits and they were separate from his investigation. (Doc. 200 at 134–35). Mr. Poole testified that Stinson himself prepared at least half of the tax returns that were the subject of these audits. (*Id.* at 134). While the taxpayers whose tax returns were the subject of these audits may not have signed expressly agreeing with the IRS deficiency determinations, 95% of these tax returns required an adjustment after auditing. (*Id.*)

[39] *See* Pl.'s Exs. 375, 499, 408, 586–590, 592–595, 597–599, 601, 602, 606, & 657 (though no penalty was assessed for 657, the audit says that the preparer did not advise properly). Stinson cites eighteen exhibits but states that only seventeen do not contain a recommendation of preparer misconduct. (*See* Doc. 219 at 62, n.191).

[40] In his post-trial brief, Stinson objects to Ms. Shields's testimony arguing that: (1) it is hearsay because it was prepared in anticipation of litigation; (2) it is an improper expert opinion; and (3) the sample is not random. (Doc. 219 at 163–173). Ms. Shields's testimony was another issue on which the Court permitted briefing during trial. (Doc. 184). The Court overruled Stinson's objection to Ms. Shields's testimony because Stinson did not provide a memorandum of law or articulate a legal basis for excluding her testimony. (Doc. 204 at 17). Despite this,

herself, that conducted interviews of twenty-seven randomly selected customers in Tampa, and thirteen customers in St. Petersburg. (*Id*. at 38–43). These revenue agents performed face-to-face and telephone interviews with the customers. (*Id*. at 44–45). The interviews were not audits and were strictly voluntary. (*Id*. at 46, 66). During the interview, the taxpayer customers were asked whether the information on their tax returns was correct. (*Id*. at 45, 79-80). At the end of the interviews, the taxpayer customers were asked to sign a declaration stating that the information they had provided was accurate. (*Id*. at 47). If, based on the interview, the revenue agents determined that the tax return contained a deficiency, Ms. Shields would use an IRS Form 4549[41] to report and identify the tax deficiency amount. (*Id*. at 47–48). Of the twenty-seven randomly selected tax returns in Tampa, twenty-one of them, or 77.7%, underreported taxes resulting in a tax deficiency of $49,363. (*Id*. at 55–57; Pl.'s Ex. 478). Of the thirteen tax returns in St. Petersburg, nine of them, or 69.2%, underreported the customers' tax liability causing a total tax deficiency of $36,573.56. (Doc. 198 at 57; Pl.'s Ex. 555). In reviewing the sample, Ms. Shields saw improper claims of Schedule C business loss,[42] EITC due diligence violations,[43] and improper claims of Schedule A losses.[44] (Doc. 198 at 59–63).

---

Stinson raises the issue again in his post-trial brief. (Doc. 219 at 163–173). The Court declines to consider Stinson's re-arguing of the matter. While the Court has the discretionary power to revisit prior decisions of its own, this is often by way of a motion for reconsideration, which was not filed in this case, and is rarely granted. *Carroll*, 2014 WL 5474048, at *5. In any event, a motion for reconsideration is not a vehicle for relitigating old issues, as Stinson is seeking to do here. *Id*. Nonetheless, even had the Court excluded Ms. Shields's testimony, the Court ultimately finds that an injunction is warranted for the reasons discussed *infra*.

[41] A Form 4549 is typically used in an audit to determine a taxpayer's deficiency or the refund due to the taxpayer. (Doc. 109 at 48). Forms 4549 can be used to conclude whether a tax return contains errors, whether an overstated income amount resulted in an EITC or whether there was a deficiency causing harm to the Government. (*Id*. at 49). Forms 4549 are completed in the normal course of business for the IRS to estimate tax harm. (*Id*. at 107).

[42] *See, e.g.*, Testimony of Gordon Jones, (Doc. 200 at 72–73, 77–79) (improper claim of Schedule C business).

[43] *See e.g.*, Rickey Hailey's testimony, (Doc. 200 at 27–28) (Form 8867 stating that taxpayer had provided school records and medical records when taxpayer testified he did not).

[44] *See e.g.*, Rickey Hailey's testimony, (Doc. 200 at 4, 6–12; Pl.'s Ex. 522) (improper claiming of business miles, vehicle expenses, and mortgage interest on 2011 return), (Doc. 200 at 15–23, Pl.'s Ex. 519) (improper claiming of charitable contributions, mortgage interest, goddaughter as dependent, and employee business expenses on 2012 return), (Doc. 200 at 26–29, Pl.'s Ex. 516) (same); Testimony of Gordon Jones (Doc. 200 at 75–79) (improper claiming of business mileage and business expenses), (Doc. 200 at 54–59, 67–68) (improper claim of charitable contribution and education credit).

## E.  Stinson's Unjust Enrichment

Stinson contracted with two third-parties to process the tax refunds of his customers—EPS Financial (for 2012–2014) and Refundo (for 2015). EPS Financial and Refundo received the customers' tax refunds from the IRS, subtracted a processing fee, and then transferred Stinson's tax preparation fees to a bank account that Stinson controlled. (Doc. 197 at 239–240, 297; Doc. 198 at 10–13). The tax preparer had determined the amount of fees that would be deducted from each tax refund, but the fees could not exceed $999 at EPS Financial, and at Refundo, any fees greater than $1,100 would be flagged. (Doc. 197 at 297; Doc. 198 at 13). The fee amounts deposited into Stinson's account were tracked through a fee detail report. (Doc. 197 at 299–300; Doc. 198 at 19–20; Pl.'s Exs. 462 & 463). The gross fees deposited to Stinson's account from EPS Financial and Refundo are as follows: $483,117 in 2012; $2,432,201 in 2013; $2,375,501 in 2014; and $2,044,311.25 in 2015.[45]  (Pl.'s Exs. 462 & 463).

For tax years 2012, 2013, and 2014 (tax returns filed and prepared in 2013, 2014, and 2015 respectively), Stinson's stores filed 1,965 tax returns with a Schedule A; 1,861 of these returns had a Schedule A that claimed unreimbursed employee business expenses. (Pl.'s Ex. 767). Stinson received at least $800,101.47 in fees for preparation of these returns. (Pl.'s Ex. 768). Additionally, for tax year 2011, Stinson was identified as the tax return preparer on tax returns including a Schedule A, Schedule C, or that reported education credits where (1) no Form 1098-T was issued by an educational institution for the taxpayer, or taxpayer's dependent, claiming the education credit, or (2) a Form 1098-T was issued but the grants or scholarships exceeded the qualifying education expenses reported on the Form 1098-T such that the taxpayer or their dependent claimed an education credit when he or she had no out-of-pocket education expenses (Pl.'s Ex. 204; Doc. 196 at 204–206 & Pl.'s Ex. 249; Pl's Ex. 346; Pl's Ex. 371; Pl's Ex. 399; Doc. 195 at 236 & Pl.'s

---

[45] Stinson has not disputed that his LLC received these amounts in fees.

Ex. 424). The evidence showed that Stinson and his employees fabricated education expenses on his customers' tax returns, claimed personal expenses as business expenses on Schedule A and Schedule C, fabricated businesses, fabricated charitable donations, and improperly conducted due diligence. (*See id*.; *see also* Doc. 197 at 251–255, 262–263, 282–288; *see supra*). Stinson received at least $149,851 in fees for the preparation of these tax returns.[46] (Pl.'s Ex. 771). Combining the tax preparation fees received for tax returns claiming unreimbursed employee expenses from tax years 2012, 2013, and 2014 ($800,101.47), with the tax returns that Stinson himself prepared in 2011 containing those forms ($149,851), the Court finds that Stinson has been unjustly enriched in the amount of $949,952.47.[47]

## II.   CONCLUSIONS OF LAW

### A.  Preliminary Legal Issues

As an initial matter, the Court rejects Stinson's argument that the Government is required to prove fraud in order to prevail.[48] The Government brought three claims against Stinson, under three separate provisions of the Internal Revenue Code: 26 U.S.C. § 7407, 26 U.S.C. § 7408, and 26 U.S.C. § 7402, only one of which requires proof of fraud. (Doc. 1). The Court has previously held that the Government is not required to prove fraud and may prevail under any of the three provisions under which it brought its claims.[49] (Doc. 143 at 7).

---

[46] There were 349 total tax returns prepared by Stinson himself in the tax year 2011. (Doc. 201 at 162). The fee amount was pulled from the e-collect tax preparation page, and the information was contained in the customer file. (*Id*. at 163).

[47] Due to an inexcusable delay on the part of Stinson's counsel, the Court denied Stinson's late motion (made during trial) to withdraw his deemed admissions. (Doc. 204). It is relevant to note that the Court does not rely on Stinson's deemed admissions for the above findings of fact, although it could have.

[48] Additionally, to the extent Stinson argues that the Government is required to prove fraud based on the doctrine of judicial admission (Doc. 219 at 190–192), the Court rejects this argument. Stinson's argument consists of a string cite of a number of cases addressing the doctrine of judicial admission. (*Id*.) In that section, Stinson does not identify the judicial admissions to which he is referring. (*Id*.) The Court assumes this relates to Plaintiff's argument in the facts section that the Government must prove fraud because it is bound by judicial admissions in the Complaint. (*Id*. at 13–32). Though the Government used the word "fraud" in its complaint, it brought three claims under different provisions of the Internal Revenue Code, only one of which requires proof of fraud. Whether the Government is required to prove fraud is a legal question, not a factual one.

[49] This ruling was affirmed by an Eleventh Circuit panel. (Doc. 163 at 15).

Additionally, Stinson has repeatedly taken the position that the Government cannot prevail because it has not presented a random sample. The Court rejected this argument in granting the preliminary injunction, and so did the Eleventh Circuit. (Doc. 69; Doc. 163 at 15–16). Stinson has yet to cite case law that requires the Government to submit evidence of a random sample in order to prevail.[50] Last, Stinson maintains that expert testimony is required. Not surprisingly, the Court has already considered and rejected this argument (Doc. 143 at 10, n.6) because Stinson cites no legal authority requiring an expert witness. (*See also* the Eleventh Circuit's Opinion on Stinson's Interlocutory Appeal (Doc. 163 at 16) ("Stinson has failed to provide any authority for his argument that the United States should have presented an expert witness or submitted only tax returns that had been audited by the IRS to support its claims of Stinson's improper practices.").

To the extent Stinson seeks to re-argue issues on which the Court requested briefing during trial (issues that the Court ruled on one day following the close of trial), including objections to admissibility of evidence and witnesses during trial, his objection to audit files as business records, Rule 26 disclosure violations, and Rule 37 sanctions, the Court will not revisit these issues at this juncture.[51] (*See* Docs. 184, 193, 203, 204). Stinson had a full and fair opportunity to brief the issues and did not file a motion for reconsideration. Even had Stinson filed such a motion, he has

---

[50] Stinson cites the following cases in his post-trial brief, all of which are inapposite to the present case: *United States v. Rosin*, 263 F. App'x 16, 34 (11th Cir. 2008) (a health care fraud criminal action where the Eleventh Circuit found there was nothing improper about the use of a sample); *U.S. ex rel. Ruckh v. Genoa Healthcare, LLC*, No. 8:11-cv-1303-T-23TBM, 2015 WL 1926417, at *3 (M.D. Fla. Apr. 28, 2015) (addresses statistical sampling in a *qui tam* action in the *Daubert* context); *United States v. Aegis Therapies*, Inc., No. cv-210-072, 2015 WL 1541491, at *10 (S.D. Ga. Mar. 31, 2015) (in a False Claims Act action, the court denied plaintiffs' request to supplement expert disclosures after statistics expert repeatedly testified that she "is not a statistician"); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, No. 12-MD-02324, 2014 WL 1669930, at *13 (S.D. Fla. Apr. 28, 2014) (order granting a *Daubert* motion and addressing whether expert's cherry-picking of five out of 1,375 scientific articles is reliable and can be extrapolated to "all healthy people"); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1321 (N.D. Ga. 2008) (considering admissibility of survey for determining likelihood of confusion in a Lanham Act case). Stinson has failed to explain how these cases relate to the present action brought under the Internal Revenue Code.

[51] The Court requested briefing because Stinson waited until trial to raise a number of objections to evidence based on discovery violations. These issues could have been addressed months, if not more than a year, prior to trial. Stinson's repeated failure to promptly raise such issues falls far below the level of practice expected in federal court. The Court declines to consider Stinson's re-argument of issues the Court ruled on in advance of post-trial briefing in an attempt to streamline the issues in this case.

not met the high standard warranting reconsideration. *See McGuire v. Ryland Grp., Inc.*, 497 F. Supp. 2d 1356, 1358 (M.D. Fla. 2007) ("[a] party who fails to present its strongest case in the first instance generally has no right to raise new theories or arguments in a motion for reconsideration.").

## B.  Count I- Permanent Injunction Pursuant to 26 U.S.C. § 7407

Section 7407, enacted as part of the Tax Reform Act of 1976, reflects a congressional intent to prevent abuses by tax preparers in the reporting of client's income tax liabilities. *United States v. Ernst & Whinney*, 735 F.2d 1296, 1302 (11th Cir. 1984). "In order to issue an injunction pursuant to § 7407, three prerequisites must be met: first, the defendant must be a tax preparer; second, the conduct complained of must fall within one of the four areas of proscribed conduct, § 7407(b)(1); and third, the court must find that an injunction is 'appropriate to prevent the recurrence' of the proscribed conduct, § 7407(b)(2)." *Id.* at 1303. Stinson contends that he is not a tax return preparer.[52] (Doc. 219 at 193–198). This Court has already determined that Stinson is a tax return preparer under 26 U.S.C. § 7701(a)(36). (Doc. No. 143 at 10) ("Stinson—by virtue of his ownership and operation of tax return preparation stores and his employment of individuals to assist in tax preparation—is a tax return preparer. Stinson owned and operated the tax preparation stores, hired employees, trained employees, and profited from his tax preparation business."); *see also United States v. Mesadieu*, 180 F. Supp. 3d 1113, 1120 (M.D. Fla. 2016) (Conway, J.). The statutory definition of tax return preparer is broadly written to include those who "employ" others to prepare tax returns. Notably, the extent of Stinson's violations of the tax laws are even more

---

[52] Stinson does not cite case law. Stinson cites the regulations that provide when a tax return preparer may be subject to penalty under §§ 6694 and 6695. This is not a case assessing preparer penalties, but rather a case addressing an injunction pursuant to § 7407. Furthermore, a number of cases refer only to 26 U.S.C. § 7701(a)(36) when defining tax return preparer for purposes of a § 7407 injunction. *See United States v. Elsass*, 978 F. Supp. 2d 901, 918 (S.D. Ohio 2013); *United States v. Pugh*, 717 F. Supp. 2d 271, 297 (E.D.N.Y. 2010); *United States v. Baxter*, 372 F. Supp. 2d 1326, 1328 (M.D. Ala. 2005); *United States v. Ratfield*, No. 01-8816-Civ, 2004 WL 3174420, at *23 (S.D. Fla. Nov. 30, 2004); *United States v. Franchi*, 756 F. Supp. 889 (W.D. Pa. 1991).

serious because the way his business operation is structured causes more violations than an individual tax return preparer is capable of. Therefore, the tax laws permit the Court to hold Stinson accountable as a tax return preparer.

Section 7407(b) lists the proscribed conduct to be enjoined.[53] If a tax preparer has engaged in the following activities, in relevant part, then injunctive relief may be appropriate:

> (A) engaged in any conduct subject to penalty under section 6694 or 6695, or subject to any criminal penalty provided by this title, . . .
> . . .
> (C) guaranteed the payment of any tax refund or the allowance of any tax credit; or
> . . .
> (D) engaged in any other fraudulent or deceptive conduct which substantially interferes with the proper administration of the Internal Revenue laws.

26 U.S.C. § 7407(b). The Government need only establish by a preponderance of the evidence that Stinson engaged in conduct subject to penalty under §§ 6694 or 6695. *United States v. Ratfield*, No. 01-8816-Civ, 2004 WL 3174420, at *23 (S.D. Fla. Nov. 30, 2004).

Pursuant to § 6694, a tax preparer violates the Internal Revenue laws where (1) the return contains an understatement of liability; (2) the understatement is "due to a position for which there was not a realistic possibility of being sustained on its merits"; and (3) the preparer knew or reasonably should have known that the position was either frivolous or not disclosed. 26 U.S.C. § 6694(a). Section 6694(a) is implicated where an individual negligently understates tax liability. *Judisch v. United States*, 755 F.2d 823, 830 (11th Cir. 1985) (stating that § 6694 addresses negligent understatement of tax liability). In contrast, § 6694(b) imposes penalties on tax preparers who prepare any return or claim for refund in a manner that violates § 6694(a) and does so willfully

---

[53] Case law indicates that an analysis of the traditional equitable factors for injunctive relief is not necessary to enter an injunction pursuant to §§ 7407 and 7408. *See Ernst & Whinney*, 735 F.2d at 1302; *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983) ("The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief."). To the extent the factors are relevant to the §§ 7407 and 7408 analysis, the Court analyzes the factors in its discussion regarding issuance of an injunction pursuant to § 7402(a).

or recklessly. 26 U.S.C. § 6694(b). "[W]illfulness does not require fraudulent intent or an evil motive; it merely requires a conscious act or omission made in the knowledge that a duty is therefore not being met." *United States v. Bailey*, 789 F. Supp. 788, 813 (N.D. Tex. 1992) (citing *Pickering v. United States*, 691 F.2d 853, 855 (8th Cir. 1982)).

A tax return preparer acts willfully "if the preparer disregards, in an attempt wrongfully to reduce the tax liability of the taxpayer, information furnished by the taxpayer or other persons." *United States v. Elsass*, 978 F. Supp. 2d 901, 918 (S.D. Ohio 2013), *aff'd* 769 F.3d 390, 398 (6th Cir. 2014)). A tax return preparer "recklessly or intentionally" disregards an IRS rule or regulation "if the preparer takes a position on the return or claim for refund that is contrary to a rule or regulation . . . and the preparer knows of, or is reckless in not knowing of, the rule or regulation in question." *Id*. A tax return preparer is reckless in not knowing a rule or regulation "if the preparer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable preparer would observe." *Id*.

The Court finds that Stinson has violated both § 6694(a) & (b) because he has both negligently and willfully prepared tax returns with the same types of false and improper claims that served to wrongfully reduce the taxpayer's liability. Notably, aside from arguing that he is not a tax return preparer, Stinson does not even address § 6694 in his brief. The Government has presented evidence of numerous tax returns containing an understatement of liability due to completely fabricated expenses, wrongfully claimed dependents or head of household, wrongfully claimed charitable contributions, and fabricated businesses. *See United States v. Burgess*, No. CV 16-4011, 2017 WL 373493, at *3 (D.N.J. Jan. 24, 2017) (holding § 6694 violated by preparation of tax returns understating customers' correct tax liabilities by fabricating dependents, Schedule C businesses, expenses, tax credits, and charitable contributions). Falsifying an amount on a tax

return is not only "unreasonable," it is willful conduct. *United States v. Franchi*, 756 F. Supp. 889, 893 (W.D. Pa. 1991). It is also a willful violation for Stinson to report amounts on tax returns that are different from the amounts provided by the taxpayer. *Elsass*, 978 F. Supp. 2d at 918. Many taxpayers testified that they had not provided the amounts used by the tax preparer, or that they had provided a different amount.

Stinson took "unreasonable" or "reckless" positions in the sense that he would report personal expenses as business expenses, or commuting miles as deductible business miles. It is common knowledge that commuting miles may not be deducted as a business expense. *See Steinhort v. C.I.R.*, 335 F.2d 496, 503 (5th Cir. 1964). Stinson not only claimed non-deductible expenses as deductible ones, but the amounts claimed were largely inflated. Stinson's conduct was repeated, continuous, and willful, occurring over multiple years and in multiple stores. Stinson knew or should have known that fabricating an amount on a tax return is unreasonable. The pattern of improper claims on tax returns prepared at Stinson's stores goes far beyond mere mistakes— the "mistakes" were "unvaryingly in the taxpayers' favor" and the exact same abusive claims were repeated among taxpayer customers. *United States v. Bailey*, 789 F. Supp. 788, 818 (N.D. Tex. 1992). Though the Court finds that Stinson's conduct was willful, at the very least, it constituted an "unrealistic position" in violation of § 6694.

Section 6695 of the Internal Revenue Code penalizes a tax preparer who fails to: furnish a copy of the tax return to the taxpayer; to sign a tax return; to furnish an identifying number that would secure the tax preparer's proper identification; to retain a copy or list of the tax return pursuant to § 6107(b); or claim the EITC without complying  with the statutory due diligence requirements. 26 U.S.C. § 6695(a)–(d), (g). Notably, in holding himself out as an experienced tax preparer, Stinson is presumed to be familiar with the Internal Revenue laws, regulations, and case law. *United States v. Venie*, 691 F. Supp. 834, 839 (M.D. Pa. 1988).

Although he was aware of the Government's claims, Stinson failed to address § 6695. (Doc. 219 at 193–198). To prevail under § 7407, it is sufficient that the Government demonstrate conduct referred to in I.R.C. § 7407(b). The Government has proffered numerous examples of due diligence violations by Stinson and his employees. First, it is inherently impossible to conduct proper due diligence while fabricating claims and amounts on a tax return. Due diligence requires the tax return preparer to make "reasonable inquiries" to ensure a taxpayer's entitlement to the EITC. 26 C.F.R. § 1.6995-2. Putting a fake amount on a taxpayer's tax return is not due diligence. Additionally, Stinson improperly completed the due diligence checklist, Form 8867, by checking boxes that the taxpayer had provided supporting documentation when the taxpayers had not provided such documentation. In addition, many taxpayers did not receive complete copies of their tax returns, making it less likely that the taxpayer would have any idea that the false amounts appeared on the tax return.

The Court also finds that Stinson engaged in "other fraudulent or deceptive conduct" because the goal of his business model was to essentially take advantage of low-income taxpayers. Stinson lured customers into his store with the promise of maximum refunds, and—contrived— maximum refunds he delivered. Many of his taxpayer customers received large refunds, which enabled him to deduct a higher fee. Stinson's customers testified that they trusted him to prepare their taxes correctly, and that they sought his services because they did not know how to prepare taxes. Stinson took advantage of his customers' general lack of any tax law knowledge, and their deference to his superior abilities such that they chose not to read through their tax returns. Stinson relied on his customers practice to simply sign their tax returns without reading them.

Once the Government establishes any of the violations enumerated in § 7407, it need only demonstrate that "injunctive relief is appropriate to prevent recurrence of such conduct." § 7407(b)(2); *United States v. Stinson*, 661 F. App'x 945, 949 (11th Cir. 2016). Notably, if the court

finds that a tax preparer "continually or repeatedly" engaged in any of the abovementioned conduct and that a narrower injunction would not be sufficient to prevent future interference with the Internal Revenue laws, the court may enjoin that person from acting as an income tax return preparer. *Ernst & Whinney*, 735 F.2d at 1302–03.

The Court may consider the following factors for determining whether a defendant is likely to violate the law again:

> (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated

*United States v. Estate Pres. Servs.*, 202 F.3d 1093, 1105 (9th Cir. 2000); *United States v. Kaun*, 827 F.2d 1144, 1149–50 (7th Cir. 1987) (considering the factors for entry of an injunction pursuant to §§ 7402(a) and 7408); *United States v. Miner*, No. 6:10-cv-1873-Orl-41DAB, 2014 WL 7361829, at *8 (M.D. Fla. Nov. 19, 2014) (citing factors that are almost identical to the Seventh Circuit factors in determining the appropriateness of a permanent injunction under §§ 7402 & 7408); *United States v. Bosset*, No. 8:01-cv-2154-T-17TBM, 2003 WL 1735481, at *3 (M.D. Fla. Feb. 27, 2003) (granting permanent injunction for violations of I.R.C. §§ 6700, 6701, 6694, 6695). Stinson has not discussed these factors in his brief and none of the factors fall in his favor.

## 1.  Gravity of Harm

This factor strongly favors the Government. Stinson's conduct spanned multiple years and occurred at multiple store locations. The sheer number of tax returns prepared by Stinson's stores—over 14,000—is cause for concern. More importantly, Stinson targeted low-income taxpayers and took advantage of their lack of tax knowledge and the attractiveness of getting a high tax refund. Stinson caused great harm to his low-income customers who have been audited and now owe relatively significant sums to the IRS. Stinson's conduct also drains administrative

resources as the Government has needed to audit many tax returns and investigate Stinson's stores. *United States v. Preiss*, No. 1:07-cv-00589, 2008 WL 2413895, at *5 (M.D.N.C June 11, 2008). Stinson's scheme additionally caused significant harm to the United States Treasury and the public by interfering with the proper administration of the Internal Revenue laws.

### 2. Extent of Stinson's Participation and Stinson's Degree of Scienter

These factors also favor the Government. Stinson was the sole owner of the LLC that owned and operated multiple tax preparation stores which were improperly preparing tax returns in a manner that is striking—an obvious and continuous pattern of reporting improper amounts for the same types of claims. Stinson either knew or should have known that his employees were improperly preparing tax returns given the pattern of false claims made on numerous tax returns. Stinson utilized scripts with predetermined responses and there is evidence that LBS instructed its employees to reach a "magic number." Ultimately, as the owner of the stores, Stinson is responsible. If he did not instruct his preparers to wrongfully claim these amounts on their customers' returns, he played an integral role by failing to oversee his own employees and correcting this practice.

### 3. The Isolated or Recurrent Nature of the Infraction, Stinson's Recognition (or Non-Recognition) of His Own Culpability, and Likelihood of Future Violations

These factors also favor the Government. Based on the duration of the scheme and the large number of returns that Stinson has prepared, this is not an isolated event. But more telling is that Stinson has not recognized his own culpability nor provided sincere assurances that such conduct will not persist. At trial, Stinson showed remorse only that his operation had been halted, he had lost a lot of friends, had been called a crook and a fraud, and had been forced to borrow money from his family. (Doc. 208 at 207–208). Not once has Stinson recognized the harm he caused his customers.

Based on the totality of the circumstances, and considering that all of these factors favor

the Government, the Court determines that an injunction under § 7407 preventing Stinson from

acting as an income tax return preparer is appropriate and necessary to prevent future interference

with the Internal Revenue laws. *See United States v. Hall*, No. 12-893-cv-W-GAF, 2013 WL

6989540, at *8 (W.D. Mo. Sept. 24, 2013) (stating that because defendant's conduct "encompassed

a broad range of false claims and deductions—such as, false charitable deductions, Schedule C's

and unreimbursed business expenses—a narrow injunction would not appropriately deter").

### C.  Count II- Permanent Injunction Pursuant to 26 U.S.C. § 7408

Pursuant to § 7408, a court may enjoin an individual from engaging in conduct subject to

a penalty under 26 U.S.C. §§ 6700 or 6701, if a court determines that the individual has engaged

in the proscribed conduct and "injunctive relief is appropriate to prevent recurrence" of the

conduct. The Government contends that Stinson is subject to penalty under § 6701. (Doc. No. 1 ¶¶

147–151). Section 6701 imposes a penalty upon any person who:

> (1) aids or assists in, procures, or advises with respect to, the
> preparation . . . of any portion of a return . . . ,
>
> (2) . . . knows (or has reason to believe) that such portion will be
> used in connection with any material matter arising under the
> internal revenue laws, and
>
> (3) . . . knows that such portion (if so used) would result in an
> understatement of liability for tax of another person.

26 U.S.C. § 6701.

The term "procures" as used in § 6701 includes "ordering (or otherwise causing) a

subordinate to do an act," as well as "knowing of, and not attempting to prevent, participation by a

subordinate  in an act." *Id*. "If a particular statement has a substantial impact on the decision-

making process or produces a substantial tax benefit to a taxpayer, the matter is properly regarded

as 'material.'" *United States v. Schiff*, 269 F. Supp. 2d 1262, 1271 (D. Nev. 2003), *order clarified*,

No. cv-S-03-0281-LDG(RJJ), 2003 WL 25780163 (D. Nev. June 20, 2003), *and aff'd*, 379 F.3d

621 (9th Cir. 2004). Similar to § 7407, in addition to meeting the requirements of a violation of § 6701, the Government must establish that an injunction is necessary to prevent the recurrence of the conduct. *United States v. Pugh*, 717 F. Supp. 2d 271, 297 (E.D.N.Y. 2010).

In *United States v. Carlson,* the Eleventh Circuit Court of Appeals held that § 6701 requires proof of fraud, and that the Government must prove a violation of § 6701 by clear and convincing evidence. 754 F.3d 1223, 1226–27 (11th Cir. 2014). The Court further reasoned that an inaccurate tax return standing alone is not sufficient circumstantial evidence to prove fraud because a mere inaccuracy in a return does not suggest that the tax return preparer knew that the returns understated the correct tax. *Id*. at 1230.

Stinson contends that the Government's evidence is insufficient to prevail under § 6701. (Doc. 219 at 180). This is not the first time this Court has heard this argument. In denying Stinson's motion for summary judgment, pursuant to *Carlson*, the Court held:

> The present case differs from *Carlson* in two important respects. First, this is not a case addressing tax preparer penalties for a violation of § 6701. Rather, the Government seeks injunctive relief, pursuant to three separate provisions of the Internal Revenue Code, each of which independently provide for injunctive relief . . . Second, the Government has not relied on inaccurate tax returns standing alone, but has provided other circumstantial evidence of Stinson's wrongdoing.

(Doc. 143 at 8).

In considering Stinson's interlocutory appeal, an Eleventh Circuit panel also rejected Stinson's argument. (Doc. 163 at 14) (stating that "Stinson's contention misapprehends the holding in *Carlson* and its application to the evidence in this case."). The Government's evidence in this case, including taxpayer and preparer testimony, is more compelling than the evidence presented in *Carlson*. (*Id*.) The Government has presented circumstantial evidence, beyond mere inaccuracies in tax returns, sufficient to show that Stinson and his tax return preparers knowingly and deliberately stated inaccurate amounts on tax returns in order to maximize his customers' tax

refunds.

Stinson violated § 6701 by filing tax returns on behalf of taxpayer customers that claimed improper Schedule A deductions (including improper unreimbursed employee expenses and fake charitable contributions), inflated and sometimes completely fabricated Schedule C business expenses, and inaccurately calculated eligibility for the EITC. "Badges of fraud" are abundant: the "mistakes" or improper claims occur repeatedly in the same categories spanning multiple years and multiple states; the mistakes were almost always in the taxpayers' favor; the IRS determined adjustments were required in those same categories; only 137 of the Schedule C businesses reported on returns prepared at Stinson's store reported a loss while 5,364 claimed a profit; many of Stinson's customers reported unreimbursed employee business expenses amounting to almost half of their annual income; there is a pattern of due diligence violations; many of the claims on tax returns contradicted documents or information provided by the taxpayer; and the taxpayers had no idea these claims were on their return.

Stinson's taxpayer customers received substantial refunds arising from these improper deductions. These false deductions relate to a "material matter" because the taxpayers' tax liability was "directly affected," and their tax refunds substantially increased, by claiming these deductions. *See Elsass*, 978 F. Supp. 2d at 937. "Statements regarding the availability of credits, deductions, or other means for reducing tax liability are material." *United States v. Hansen*, No. 05-cv-0921-L (CAB), 2006 WL 4075446, at *10 (C.D. Cal. Dec. 13, 2006). Stinson has not provided evidence or authority suggesting that these amounts are not material.

It is well-established that commuter business miles are a non-deductible expense; that personal expenses, such as a personal cell-phone, are a non-deductible expense; and that fabricating a business and its corresponding income and expenses is improper. The tax return preparers at Stinson's stores received at least a basic level of training and Stinson asserts that he

provided this basic training to his employees. Moreover, a tax return preparer, like Stinson, is presumed to be familiar with the internal revenue laws. Therefore, the Court concludes that Stinson knew that the improper deductions claimed on tax returns prepared by his stores understated the tax liability of his customers and were wholly improper under the Internal Revenue Code. *Venie*, 691 F. Supp. at 839.

All of the taxpayers testified that they had not provided the preparer with the false amounts and did not know the amounts were on their tax returns. Many of the taxpayers were shocked that the claims were on their tax returns. The Court is not persuaded by Stinson's contention that "each of these citizens chose to subvert the Internal Revenue laws on their own without the knowledge, acquiescence, and assistance" of Stinson. *Franchi*, 756 F. Supp. at 893. Whether Stinson personally or directly engaged in this conduct does not matter under § 6701 because liability may also be imposed on one who "aids or assists in, procures or advises." 26 U.S.C. § 6701. Stinson, as the company owner, certainly aided and assisted this conduct. The Government has presented sufficient circumstantial evidence to infer that Stinson knew that the claims he was making were not only improper, but completely fabricated. Therefore, the Court concludes that Stinson violated § 6701. *Baxter*, 372 F. Supp. 2d at 1329. The Government has proven by clear and convincing evidence that Stinson engaged in fraudulent conduct by making improper, inflated, and false claims on tax returns that concerned a "material matter" and resulted in an understatement of liability.

Under § 7408, it is also proper for the Court to consider whether Stinson's conduct is likely to recur, and the Court may consider the same factors to predict the likelihood of future violations. *U.S. v. ITS Fin., LLC*, 592 F. App'x 387, 400 (6th Cir. 2014). Because the analysis is the same as outlined above in the discussion of a § 7407 injunction, the Court need not repeat it here. For the same reasons as outlined above, the Court finds that Stinson's conduct is likely to be repeated in

the future and that an injunction under § 7408 is warranted.

### D.  Count III- Permanent Injunction Pursuant to 26 U.S.C. § 7402(a)

"In addition to IRC § 7408, IRC § 7402(a) gives the district courts power to issue injunctions as may be necessary or appropriate for the enforcement of the internal revenue laws." *Ratfield*, 2004 WL 3174420, at *22. The traditional factors for entry of a permanent injunction must be satisfied to issue an injunction pursuant to § 7402(a). *Ernst & Whinney*, 735 F.2d at 1300. "The language of § 7402(a) encompasses a broad range of powers necessary to compel compliance with the tax laws." *Id.* Furthermore, "there need not be a showing that a party has violated a particular Internal Revenue Code section in order for an injunction to issue." *Id.* "Even if [the defendant's] business structure somehow left [him] outside the legal definition of tax return preparer[], broad relief would still be appropriate, as § 7402(a) is undoubtedly designed to prevent individuals from undermining the Nation's tax laws through exploiting loopholes in the I.R.C.'s overall regulatory scheme." *Elsass*, 978 F. Supp. 2d at 941. "It is sufficient under § 7402 for the Government to prove a pattern of gross negligence or recklessness, so long as injunctive relief is 'necessary or appropriate for the enforcement of the internal revenue laws.'" § 7402(a). *United States v. Stinson*, 661 F. App'x 945, 952 (11th Cir. 2016). The Court has already found that Stinson's conduct interferes with the administration of the internal revenue laws. An injunction is appropriate because the Court determines that the traditional equitable principles warrant it.

Under traditional equitable principles, the Government seeking a permanent injunction must demonstrate: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the Government and Stinson, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*,

547 U.S. 388, 391 (2006). Stinson has not addressed these factors. After considering these factors in light of the evidence presented at trial, the Court finds that all four factors favor an injunction.

### 1. Irreparable Injury

The Government has suffered irreparable harm, including loss of millions of dollars to the United States Treasury. The Government's customers have suffered irreparable harm because they now owe additional taxes and penalties that they may not be able to afford. Stinson's fraudulent scheme has undermined the public trust in the tax laws. Furthermore, the Government has had to expend administrative resources investigating Stinson and conducting audits. Last, absent an injunction, the Government would be forced to continue to use resources monitoring Stinson. For these reasons, and because Stinson has not provided argument to the contrary, the Court finds that the irreparable injury would result without an injunction.

### 2. Inadequate Remedies at Law

Though the Government need not prove that there is an inadequate remedy at law under § 7402(a), *United States v. Molen*, No. CIVS-03-1531 DFL GGH, 2003 WL 23190606, at *3 (E.D. Cal. Dec. 12, 2003), the Court finds that there is no adequate remedy at law because Stinson's continued operation causes irreparable harm to his customers and the public at large and there is no way of stopping him from fraudulently preparing taxes absent an injunction. "Other remedies available to the Government involve actions against each individual taxpayer who follows [the tax return preparer's] advice" an endeavor that requires "the expenditure of substantial amounts of the limited resources of the IRS and necessarily would not be as effective as enjoining [the tax return preparer]." *Ratfield*, 2004 WL 3174420, at *22.

### 3. Balance of Hardships

The Government has demonstrated that the balance of hardships tips in its favor. At trial, Stinson expressed that he has lost some friends and has been called a crook and a thief. Additionally, Stinson has had to borrow money from his family. In contrast, if an injunction is not granted, enormous administrative resources will be required to monitor him. The United States Treasury is at risk of being wrongfully depleted of funds. Continued operation of a fraudulent tax business undermines the tax laws. Additionally, the hardship the Court is most concerned about is Stinson's vulnerable customers, who will be harmed by his fraudulent tax preparation business and who face financial hardships as a result of Stinson making false claims on their tax returns. The Court is cognizant that, if an injunction is granted, Stinson will be prohibited from operating his tax preparation business. However, Stinson also owns rental real estate property and an injunction does not prevent him from making a living in any manner aside from tax preparation. Therefore, the Court finds that the balance of hardships favors the Government.

### 4. Public Interest

The public interest factor also favors the Government. "By defrauding the IRS, [a tax return preparer] is in reality defrauding every law-abiding American, who, at not insubstantial effort, pays their due fund to the programs of the nation." *Preiss*, 2008 WL 2413895, at *11. "[T]he public has a strong interest in minimizing the number of false claims for refunds that are made and in ensuring that tax preparers follow the law." *Id*. Furthermore, as outlined above, Stinson harms his customers who are relying on his business to properly handle their taxes. In return, Stinson's business exposes these primarily low-income customers to individual tax liability, added interest, and potential penalties.

The Court has determined that Stinson's conduct interferes with the proper administration of the internal revenue laws and that an injunction is appropriate and necessary to prevent future harm. The Court has also considered the traditional equitable factors and concluded that each factor

favors the imposition of an injunction. Therefore, the Court finds an injunction pursuant to § 7402(a) is warranted.

### E.  Disgorgement Pursuant to 26 U.S.C. § 7402(a)

Because "§ 7402(a) encompasses a broad range of powers necessary to compel compliance with the tax laws," the Court has determined that disgorgement is an available remedy in this case. *See Mesadieu*, 180 F. Supp. 3d at 1118 (quoting *Ernst & Whinney*, 735 F.2d at 1300). Disgorgement in the amount of a defendant's "ill-gotten gains" constitutes a "fair and equitable" remedy as it reminds the defendant of its legal obligations, serves to deter future violations of the Internal Revenue Code, and promotes successful administration of the tax laws. *Id*.

As a tax return preparer, Stinson is subject to the remedy of disgorgement. (Doc. No. 143 at 10). Stinson should not be permitted to insulate himself from liability because he delegates responsibility for preparing tax returns. *See ITS Fin., LLC*, 592 F. App'x at 397. Stinson argues, without citation to authority, that he cannot be held individually liable for disgorgement because his LLC, and not he, received the tax preparation fees. (Doc. 219 at 188). The Court is not persuaded. First, the Government presented evidence that Stinson commingled personal and business funds in his LLC's bank accounts, and that Stinson had signature authority on those accounts. Second, disgorgement is an equitable remedy the purpose of which is to divest Stinson of funds he received from his fraudulent conduct. *See United States v. Lawrence*, No. 15-62233-CIV, 2016 WL 5390569, at *6 (S.D. Fla. Sept. 27, 2016). Because Stinson's unjust enrichment was directly derived from utilizing his LLC as "a conduit for improper and fraudulent tax return preparation," Stinson may be ordered to disgorge those ill-gotten gains. *Id*. Third, Stinson is responsible for the tortious acts he has committed. *See L.C.L Theatres, Inc. v. Columbia Pictures Indus., Inc*. 619, F.2d 455, 457 (5th Cir. 1980)[54] (holding that it is unnecessary to pierce the

---

[54] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit held that

corporate veil because "[a]n officer or any other agent of a corporation may be personally as responsible as the corporation itself for tortious acts when participating in the wrongdoing."); *see also Buckner v. Luther Campbell*, No. 09-22815-CIV, 2010 WL 5058314, at *2 (S.D. Fla. Dec. 6, 2010) ("[I]f an officer, director, or agent commits or participates in a tort, whether or not his actions are by authority of the corporation or in furtherance of the corporate business, that individual will be liable to third persons injured by his actions, regardless of whether liability attaches to the corporation for the tort."); *Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co., L.L.C.*, 125 F. Supp. 2d 1093, 1104 (S.D. Fla. 2000) ("While it is true that a director or an officer is not personally liable for any act or failure to act regarding corporate management or policy, it does not follow that the officer or individual is shielded from accountability for tortious conduct.").

To be entitled to disgorgement, the plaintiff need only produce a reasonable approximation of the defendant's ill-gotten gains. *See S.E.C. v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id*. Once a plaintiff presents its estimate, the burden shifts to the defendant to show that the plaintiff's estimate was not a reasonable approximation. *S.E.C. v. Lauer*, 478 F. App'x 550, 557 (11th Cir. 2012). If "a defendant's record-keeping or lack thereof has so obscured matters that calculating the exact amount of illicit gains cannot be accomplished without incurring inordinate expense, a court may set disgorgement at the more readily measurable proceeds received from the unlawful transactions." *Id*. There must be a "relationship between the amount of disgorgement and the amount of ill-gotten gain," and a district court may not order disgorgement of an amount obtained

---

the decisions of the Former Fifth Circuit handed down before September 30, 1981 shall be binding as precedent in the Eleventh Circuit.

without wrongdoing or obtained during a period where there is no record evidence of fraud. *C.F.T.C. v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999). Therefore, a court's power to order disgorgement is not unlimited. It extends only to the amount the defendant profited from his wrongdoing. *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005). Any additional sum is impermissible as it would constitute a penalty. *Id.*

The Government has requested $1,584,481.79 as a disgorgement award. (Doc. 218 at 99). The Government breaks this request into the following categories (*See* Doc. 218 at 97–99):

| Amount | Tax Years (not year of filing) | Explanation |
|---|---|---|
| Category (1): $800,101.47 | 2012, 2013, 2014 | In these years, Stinson's stores filed 1,965 tax returns with a Form Schedule A, and 1,861 of those tax returns had a Form Schedule A claiming unreimbursed employee business expenses. The amount here is the total fees Stinson collected from those 1,861 tax returns. (Pl.'s Ex. 768). |
| Category (2): $149,851.00 | 2011 | This fee amount is derived only from tax returns that identify Stinson as the paid preparer and that included a Schedule A, Schedule C, or reported education credits where (1) no Form 1098-T was issued by an education institution for the taxpayer or a dependent; or (2) the grants or scholarships reported on the Form 1098-T exceeded qualifying education expenses. Because Stinson was shown to have fabricated education expenses and claimed personal expenses as business expenses, the Government contends that fees from these tax returns are appropriate for disgorgement. (Pl's Ex. 771). |
| Category (3): $155,344.50 | 2011, 2012, 2013 | This amount represents fees Stinson received for tax returns that the IRS audited during Mr. Poole's investigation of Stinson and that were found to underreport tax. (Pl.'s Ex. 774). |
| Category (4): $32,185.00 | 2012, 2013, 2014 | This amounts represents fees Stinson received for the preparation of tax returns for customers residing outside of Florida whose deposition testimony was introduced at trial. (Pl.'s Ex. 772). |
| Category (5): $29,775.00 | 2011, 2014 | This amount represents fees Stinson received from customers who testified at trial that there were fabricated amounts on their tax returns, including customers within the Middle District of Florida ($15,141 in fees), five customers whose depositions were stipulated to ($8,630 |

| | | |
|---|---|---|
| | | in fees), and other depositions admitted at the preliminary injunction hearing ($6,004 in fees). (Pl.'s Exs. 462 & 463). |
| **Category (6):** $440,995.82 | 2013 | This amount is derived from Ms. Shields's 2016 sampling. Ms. Shields found a 75% error rate. The fees collected from the Tampa sample totaled $376,833.93 (Pl.'s Ex. 777), 75% of that is $282,625.45. The fees from the St. Petersburg sample totaled $211,160.49, 75% of that is $158,370.37 (Pl.'s Ex. 777). This amount represents the total of 75% of the fees from the St. Petersburg sample and the Tampa Sample. |
| **TOTAL** | $1,608,252.79[55] | |

The Government's request for total fees from all of these categories is not a reasonable approximation because the Court cannot discern whether fees from categories (1) and (2), which includes years 2011–2014, are duplicated in categories (3), (4), (5), and (6) because those categories include fees from the same years. It is not a reasonable approximation to seek disgorgement from Stinson for twice the amount of fees for the same tax returns. For this reason, the Court will not order a disgorgement award for the fee amounts in categories (3)–(6). The Government has not shown that fees in those categories are distinct fees from those already included in categories (1) and (2).

The Court finds that the amount of fees in category (1) represents a reasonable approximation of Stinson's "ill-gotten gain" because this amount encompasses all the years that the Government presented evidence of fraudulent tax practices and also focuses on the categories where the Court has found a pattern of abusive claims (Form Schedule As reporting unreimbursed employee business expenses). Furthermore, the Court finds that the fees from category (2) are also reasonable because they are fees derived from tax returns that Stinson himself prepared, they also

---

[55] In the Government's brief, it asks for $1,584,481.79 (Doc. 218 at 99). The Court is unable to calculate this total from the amounts given by the Government, as outlined in this chart.

consist of categories where fraud was prominent, and the fees are derived from a tax year that was not included in category (1). Because the Government presented evidence of fabricated amounts on Schedule As, Schedule Cs, and with regard to education credits and other deductions, on "return after return," the Court finds it reasonable to use tax returns containing these types of claims to approximate Stinson's unjust enrichment. *Barber*, 591 F. App'x at 813. The Court finds that the total fees from categories (1) and (2)—$949,952.47—fairly encompasses the other proposed categories of fees, without duplication, and represents a reasonable approximation of Stinson's ill-gotten gains. The burden then shifts to Stinson to demonstrate that the Government has not presented a reasonable approximation.

Out of Stinson's two-hundred plus pages of post-trial briefing, he dedicated approximately two pages to the issue of disgorgement, no part of which argues that the Government's calculations are not reasonable. (Doc. 219 at 211–212). Stinson's argument appears to be that it is not his burden to come forward with a reasonable approximation and that the Government has not identified fraudulent returns nor provided "upper and lower bounds" of "confidence intervals" or a statistically random sample. (*Id*. at 211). Stinson is incorrect—the burden shifted to him once the Government presented a reasonable approximation of his ill-gotten gains. *Lauer*, 478 F. App'x at 557. Because at least part of the Government's disgorgement amount represents a reasonable approximation of Stinson's unjust enrichment, and Stinson has not shown that this amount is unreasonable, the Court will order disgorgement in the amount of $949,952.47. The Court declines to entertain Stinson's absurd request for sanctions against the Government.

## F.  ORDER OF PERMANENT INJUNCTION

Based on the foregoing, the Court finds in favor of the Plaintiff, United States of America, and the Court enters the following **ORDER** of permanent injunction against Defendant, Jason P. Stinson:

A.     Jason Stinson, and all those in active concert or participation with him, is permanently enjoined from:

(1)     acting as a federal tax return preparer or requesting, assisting in, or directing the preparation or filing of federal tax returns, amended returns, or other related documents or forms for any person or entity other than himself;

(2)     preparing or assisting in preparing federal tax returns that he knows or reasonably should have known would result in an understatement of tax liability or the overstatement of federal tax refund(s) as penalized by I.R.C. § 6694;

(3)     owning, operating, managing, working in, controlling, licensing, consulting with, or franchising a tax return preparation business;

(4)     training, instructing, teaching, and creating or providing cheat sheets, memoranda, directions, instructions, or manuals, pertaining to the preparation of federal tax returns;

(5)     engaging in any other activity subject to penalty under I.R.C. §§ 6694, 6695, 6701, or any other penalty provision in the I.R.C.;

(6)     maintaining, assigning, holding, using, or obtaining a Preparer Tax Identification Number (PTIN) or an Electronic Filing Identification Number (EFIN); and

(7)     engaging in any conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

B.     Jason Stinson shall immediately and permanently close all tax return preparation stores that he owns directly or through Nation Tax Services, LLC, or any other entity, and whether those stores do business as LBS Tax Services, Nation Tax Services, or under any other name.

C.     Jason Stinson is prohibited, either directly or through Nation Tax Services, LLC or any other entity, from assigning, transferring, or selling any franchise agreement, independent

contractor agreement, or employment contract related to LBS Tax Services, Nation Tax Services, or any other tax return preparation business to which he or any entity under his control is a party.

D.      Jason Stinson is barred from: (1) selling to any individual or entity a list of customers, or any other customer information, for whom Jason Stinson, LBS Tax Services, Nation Tax Services, and any other business or name through which Stinson or those acting at his direction have at any time since 2010 prepared a tax return; (2) assigning, disseminating, providing, or giving to any current or former franchisee, General Sales Manager, District Sales Manager, other manager, tax return preparer, employee, or independent contractor of Stinson, LBS Tax Services, Nation Tax Services, or any other business through which Stinson prepares tax returns or owns or franchises a tax return preparation business, a list of customers or any other customer information for customers for whom Jason Stinson, LBS Tax Services, Nation Tax Services, and any other business or name through which Stinson or those acting at his direction have at any time since 2010 prepared a tax return; and (3) selling to any individual or entity any proprietary information pertaining to LBS Tax Services, Nation Tax Services, and any other business or name through which Stinson or those acting at his direction have at any time since 2010 prepared a tax return.

E.      Jason Stinson shall contact, within 30 days of this Order, by United States mail and, if an e-mail address is known, by e-mail, all persons for whom Jason Stinson, LBS Tax Services stores owned or managed by Stinson, and Nation Tax Services prepared federal tax returns or claims for a refund for tax years 2010 through the present to inform them of the permanent injunction entered against him, including sending a copy of this Order but not enclosing any other documents or enclosures unless agreed to by counsel for the United States or approved by the Court.

F.      Jason Stinson shall produce to counsel for the United States, within 30 days of this Order, a list that identifies by name, social security number, address, e-mail address, and telephone

number and tax period(s) all persons for whom Jason Stinson, LBS Tax Services stores owned or managed by Stinson, and Nation Tax Services prepared federal tax returns or claims for a refund for tax years beginning in 2010 and continuing through this litigation.

G.      Jason Stinson shall produce to counsel for the United States, within 30 days of this Order, a list that identifies by name, address, e-mail address, and telephone number all principals, officers, managers, franchisees, employees, and independent contractors of Stinson, LBS Tax Services stores owned or managed by Stinson, and Nation Tax Services, LLC, from 2010 to the present.

H.      Jason Stinson shall provide a copy of this Order to all principals, officers, managers, franchisees, employees, and independent contractors of Stinson and Nation Tax Services, LLC, within 15 days of this Order, and provide to counsel for the United States within 30 days a signed and dated acknowledgment of receipt of this Order for each person whom Jason Stinson provided a copy of this Order.

I.      The Court retains jurisdiction over Jason Stinson and over this action to enforce this permanent injunction entered against him.

J.      The United States is permitted to conduct discovery to monitor Jason Stinson's compliance with the terms of this permanent injunction entered against him.

## G.      CONCLUSION

The Court has determined that Stinson shall be enjoined under 26 U.S.C. §§ 7402(a), 7407, 7408. The Court further determined that a disgorgement remedy is appropriate. Based on the foregoing, it is **ORDERED** as follows:

1. The Clerk is **DIRECTED** to enter judgment providing that the Plaintiff the United States of America shall recover from the Defendant Jason P. Stinson a judgment in the amount of

$949,952.47 as equitable monetary relief. The Plaintiff the United States of America shall recover costs of this action.

2.   Further, the Court orders that the Defendant Jason P. Stinson shall be permanently enjoined as provided in § F. (p. 45–48) above.

3.   The clerk is **DIRECTED** to close this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on March 6, 2017.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record